UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1298

UNITED STATES,

Appellee,

v.

GARY P. NEAL,

Defendant, Appellant.

No. 93-1334

UNITED STATES,

Appellee,

v.

WILLIAM F. KENNEY, JR.,

Defendant, Appellant.

No. 93-1335
UNITED STATES,

Appellee,

v.

CHARLES J. FLYNN, a/k/a CHUCKY,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Shane Devine, Senior U.S. District Judge]

Before

Selya and Boudin, Circuit Judges,

and Carter,* District Judge.

Paul W. Pappas, by Appointment of the Court, for appellant

Gary P. Neal.
Michael J. Iacopino, by Appointment of the Court, with whom

Timothy I. Robinson and Brennan, Caron, Lenehan & Iacopino were

on brief for appellant William F. Kenney, Jr.
Robert Sheketoff with whom Sheketoff & Homan was on brief

for appellant Charles Flynn.
Robert J. Veiga, Assistant United States Attorney, with whom

Paul M. Gagnon, United States Attorney, was on brief for

appellee.

September 30, 1994

* Of the District of Maine, sitting by designation.

-2-

CARTER, Chief District Judge. Appellants Charles

Flynn, William Kenney, and Gary Neal were found guilty by a jury

on a number of criminal charges stemming from a series of armed

robberies that took place in New Hampshire. Appellants challenge

their convictions on the basis of various pre-trial, trial, and

post-trial rulings issued by the court as well as statements made

by the Government. We affirm on all but two of the issues raised

by Appellants.

The first of these issues involves various Jencks Act

requests made by Appellant Flynn. We find that the record

indicates the district judge may have applied an erroneous legal

standard in ruling that various materials did not qualify as

statements under the Jencks Act. Accordingly, we will remand to

the district court for an evidentiary hearing to determine

whether statements demanded by Appellant Flynn should have been

disclosed under the Jencks Act and, if so, whether nondisclosure

constituted harmless error. We also remand to the district court

on the issue of the order of restitution entered against

Appellant Neal with instructions that a hearing be held to

determine whether the full amount of monetary losses suffered by

First New Hampshire Bank was caused by the conduct underlying

Neal's convictions.

At this point in the proceedings, we choose not to

vacate the court's Jencks Act rulings or the order of restitution

but instead remand to the district court for the limited purpose

of making supplemental findings with regard to these two issues.

-3-

In the interim, we will retain appellate jurisdiction so that we

may review the court's augmented record and subsequent

determinations.

FACTUAL BACKGROUND

Appellants were tried by a jury in the District of New

Hampshire during the months of October and November of 1992. The

evidence presented and believed by the jury demonstrated that

Appellants were involved, in varying capacities, in carrying out

five armed robberies over a five-month period beginning with the

armed robbery of a supermarket and ending in armed robbery of the

First New Hampshire Bank ("First N.H.").1 Appellants were tried

1 Appellants were initially indicted for committing seven crimes
which included:

(1) the armed robbery of the Demoulas
Market Basket, a supermarket in
Portsmouth, New Hampshire, on April
13, 1991;

(2) the armed robbery of an employee of
the Abercrombie and Finch restaurant
as she was attempting to make a night
deposit of $4800 at a Fleet Bank in
North Hampton, New Hampshire on
May 19, 1991; the jury rendered a not
guilty verdict on counts involving
this robbery;

(3) the armed robbery of an employee of a
retail store called the Dress Barn
while she was attempting to deposit
$763 into the night deposit box at
the First National Bank of
Portsmouth, New Hampshire on June 7,
1991;

(4) the armed robbery on June 30, 1991,
of an employee of Phantom Fireworks,
Inc. in Seabrook, New Hampshire;
counts involving this robbery were

-4-

on a thirty-two-count indictment charging them as follows:

Counts 1 and 2 charged Appellants Flynn

and Kenney with violations of the
Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. 1962(c)
and (d), with each of the seven robberies
alleged as predicate acts;

Count 3 charged all three Appellants with

conspiracy to commit robbery of First
N.H. in violation of 18 U.S.C. 371 and
18 U.S.C. 2113(a) and (d);

Counts 4 and 5 alleged that Appellants

Flynn and Kenney committed armed and
unarmed bank robbery of First N.H., in
violation of 18 U.S.C. 2113(d) and (a)
and 18 U.S.C. 2;

Counts 6 through 15, 17, and 18 alleged

conspiracy and interference with commerce
by threats or violence, in violation of
the Hobbs Act, 18 U.S.C. 1951, with one
or more counts corresponding to each of
the seven robberies. Flynn was named in
all counts; Kenney was named in counts 8
through 18;

Counts 16 and 20 through 25 charged the

use and carriage of firearms during and
in relation to crimes of violence, in
violation of 18 U.S.C. 924(c)(1), with

dismissed by the court;

(5) the armed robbery on August 3, 1991,
of the home of James Fitzpatrick, the
owner of a chain of stores known as
Lighthouse Markets, Inc., in Hampton,
New Hampshire;

(6) the armed robbery on August 17, 1991,
of the person of James Fitzpatrick
after he made his night rounds to
collect receipts at each of his
stores; and

(7) the armed robbery of the First N.H.
in Stratham, New Hampshire on
September 9, 1991.

-5-

each count corresponding to one of the
seven robberies. Flynn was named in all
counts and Kenney was named in all counts
except Count 20;

Counts 19 and 26 through 29 charged

possession of a firearm by a convicted
felon, in violation of 18 U.S.C.
922(g). Flynn was named in Count 19
only; Kenney was named in Count 26 only;

Count 30 charged Appellant Neal as an

accessory after the fact, in violation of
18 U.S.C. 3;

Count 31 charged money laundering against

Appellants Neal and Flynn, in violation
of 18 U.S.C. 1956 and 18 U.S.C. 2;
and

Count 32 charged criminal forfeiture of a

1987 Nissan automobile against Neal and
Flynn, in violation of 18 U.S.C. 981
and 1956.

Government's Consolidated Brief at 3-6.

Appellants were initially charged with three other co-

conspirators, Bruce Raineri, Brian Raineri, and Richard Ferguson.

These three men pled guilty and cooperated to varying extents

with the Government. Several other alleged co-conspirators,

including Arthur Cosgro and Thomas McQueeney, also provided

evidence against Appellants.

The evidence presented during the thirty-one-day trial

is sufficient to justify the following conclusions of fact.

Appellant Charles Flynn, a/k/a "Chuckie," was the leader and

organizer of the group of co-conspirators. Flynn scoped out

robbery locations, devised the plans, and recruited others to

commit or assist in the crimes. Appellant William Kenney

participated as the gunman and shared in proceeds of four

-6-

robberies planned by Flynn, excluding the Market Basket robbery.

Kenney also assisted Flynn in

-7-

surveilling armored cars that serviced various stores and banks

which were prospective robbery sites. Appellant Gary Neal played

a more limited role in the overall conspiracy (this is reflected

by the fact that he was indicted on only four counts and found

guilty on two counts limited to the bank robbery).2 The

evidence demonstrated that Neal provided his home to the co-

conspirators where they planned the bank robbery and took refuge

after they committed the crime. Immediately following the

robbery, Neal carried a box from the getaway car into his home

containing the gun used in the bank robbery along with the stolen

proceeds. He also used proceeds from the robbery to purchase a

car in his name that was used by Flynn and Kenney to travel to

Arizona and then to California in order to escape the scene of

the crime. On their trip, Flynn and Kenney disposed of clothes

used in the crime and stored the gun used in all five crimes in a

garage belonging to Patricia Ferguson, a co-conspirator's

relative.

On defendants' motions at the close of the evidence,

the court dismissed RICO Counts 1 and 2, finding the Government

failed to demonstrate a sufficient continuity of offenses. The

court also dismissed Counts 12, 13, and 23, all involving the

Phantom Fireworks robbery. The jury then rendered its verdicts,

finding Flynn guilty on all remaining charges against him except

Counts 8, 9, and 21, involving the night deposit robbery of an

2 The four counts include conspiracy to commit bank robbery,
accessory after the fact to bank robbery, money laundering, and
criminal forfeiture.

-8-

employee of Abercrombie and Finch restaurant. The jury found

Kenney guilty on all remaining counts against him except for the

counts involving the Abercrombie and Finch robbery and found Neal

guilty of being an accessory after the fact and money laundering,

as alleged in Counts 30 and 31, but not guilty on count 3,

alleging conspiracy to rob First N.H.

DISCUSSION

Appellants raise a litany of challenges against various

rulings issued by the district court judge and statements made by

the Government throughout the proceedings. The Court finds merit

in Appellant Flynn's argument that both the Government and the

district judge were operating under an improper legal standard in

determining what statements qualified as Jencks Act material and

should have been disclosed to the defense during trial. The

Court also finds merit in Appellant Neal's argument that the

court erred in ordering $266,500 in restitution against him for

his role in the First N.H. robbery. These arguments will be

treated first. The Court finds no merit in Appellants' remaining

claims which will be discussed, in turn, in the order of joint

challenges raised by Appellants followed by challenges raised

individually by Flynn, Kenney, and Neal.

I. LEGAL STANDARD USED BY THE

COURT AND GOVERNMENT IN DETERMINING WHAT

EVIDENCE SHOULD BE DISCLOSED TO APPELLANT FLYNN

A. Brady Claims

Appellant Flynn has framed much of his argument on

appeal in terms of a Brady violation. Brady v. Maryland, 373

-9-

U.S. 83 (1963)(holding that a prosecutor's suppression of

evidence favorable to and requested by a defendant violates due

process where the evidence is material to guilt or to

punishment). Appellant points to statements in the record

indicating that the Government attorney harbored an erroneously

narrow view of what materials were exculpatory and should have

been disclosed to the defense pursuant to Brady and its progeny.

Flynn acknowledges that the Government provided certain disputed

materials to the trial court for in camera review. However, he

argues that the Government's erroneous view of what qualified as

Brady, as a threshold matter, most likely resulted in the

withholding of many other exculpatory materials from the court.

He requests this Court to unseal the documents that were turned

over, remand the case for further hearing in the district court,

and order that the Government disclose all other Brady material

in its possession.

A careful and thorough review of the record supports

Appellant's assertion that the Government attorney misunderstood

the reach of Brady.3 However, in virtually every instance of

3 In one example of this misunderstanding, Appellant's counsel
inquired whether any Brady material existed with respect to
Richard Ferguson, a co-conspirator who cooperated with the
Government. The Government attorney replied:

First of all, it's not Brady material.
If it's anything, it's impeachment
material, if it is even that.

Tr. (October 19, 1992) at 115. In a second incident, the
Government attorney stated that:

Prior inconsistent statements are not

-10-

dispute pointed out by Appellant and the Government, the

Government attorney indicated on the record that all materials

related to the witness in question were being turned over to the

district judge for review.4 Appellant makes no argument that

Brady. I'll be happy at some point to
give Mr. Wilson a lesson in the
difference between Brady and impeachment
material, but there is a difference all
the way up to the United States Supreme
Court.

Tr. (October 20, 1992) at 77.

These statements reflect a misunderstanding on the
Government's part of the Brady rule. The Supreme Court has

clearly stated that impeachment evidence may well qualify as
Brady material. United States v. Bagley, 473 U.S. 667, 676

(1985); Giglio v. United States, 405 U.S. 150, 154 (1972). As

the Court explained in Giglio:

When the 'reliability of a given witness
may well be determinative of guilt or
innocence,' nondisclosure of evidence
affecting credibility falls within th[e]
general rule [of Brady].

Giglio, 405 U.S. at 154.

The significance of the Government's failure to appreciate the
nature of exculpatory evidence under Brady is demonstrated by its
evaluation of materials related to the witness James Fitzpatrick,
who was testifying about a robbery of his home. Tr. (October
28, 1992) at 115. The court reviewed these materials, which the
Government had claimed did not fall under Brady, and disclosed
them to the defense because it found that the materials contained
exculpatory evidence. Id. at 121. The defense was able to use

the materials quite effectively in the cross-examination of
Fitzpatrick. Id. at 123-24 and 126-44.

4 All materials were supplied for the court's review regarding
Brady or Jencks Act requests with respect to witnesses Laura

MacPherson, Tr. (October 8, 1992) at 119-21; Anita Ramsdell, Id.

at 217; Richard Ferguson, Tr. (October 9, 1992) at 225-26, Tr.
(October 14, 1992) at 153; Sergeant Coleman Forbes, Tr. (October
15, 1992) at 123, Tr. (October 16, 1992) at 142; Terrence
Kinneen, Tr. (October 16, 1992) at 91; Douglas Scamman, Tr.
(October 19, 1992) at 172-74; Arthur Cosgro, Tr. (October 20,

-11-

the district judge erred in his understanding of Brady, other

than pointing out that the judge never corrected the Government

attorney when he mischaracterized Brady's mandate. Our reading

of the record satisfies us that the district judge

conscientiously reviewed all materials in question. Because

Appellant points to no other evidence to indicate that

exculpatory evidence was withheld in violation of Appellant's

Fifth Amendment right to a fair trial, we affirm the district

court's Brady rulings.

B. Disclosure Under the Jencks Act

Appellant's other argument, that the Government

attorney too narrowly construed the reach of the Jencks Act, has

much more bite because the record indicates that the district

judge adopted the Government's misinterpretation and ruled

against several Jencks Act requests on an erroneous legal ground.

Before discussing the legal error in detail, it is necessary to

consider the purpose and provisions of the Act.

The Jencks Act establishes procedures whereby a

criminal defendant may exercise his limited right to obtain

previous statements made by government witnesses that are in

possession of the United States Government to be used for

impeachment purposes. 18 U.S.C. 3500. Subsections (a) and (b)

of the Act provide that prior statements are not subject to

1992) at 74; Linda Sherouse, Tr. (October 27, 1992 -- afternoon
session) at 87; Thomas McQueeney and Brian Raineri, Tr. (October
28, 1992) at 17, Tr. (November 2, 1992) at 3-4, Tr. (November 3,
1992) at 219-20; James Fitzpatrick, Tr. (October 28, 1992) at
115, 121.

-12-

disclosure until the witness has testified on direct examination

and are available only to the extent that the statements relate

"to the subject matter as to which the witness has testified."

18 U.S.C. 3500(a) and (b). The Act further requires the

defendant to make a motion for production. 18 U.S.C. 3500(b).

Subsection (e) defines "statements" subject to the Act as

follows:

(1) a written statement made by said
witness and signed or otherwise
adopted or approved by him;
(2) a stenographic, mechanical,
electrical, or other recording, or
a transcription thereof, which is a
substantially verbatim recital of
an oral statement made by said
witness and recorded
contemporaneously with the making
of such oral statement; or
(3) a statement, however taken or
recorded, or a transcription
thereof, if any, made by said
witness to a grand jury.

18 U.S.C. 3500(e).

At issue in this case is the reach of subsections

(e)(1) and (e)(2) which first came into dispute on the third day

of trial. 18 U.S.C. 3500 (e)(1) and (e)(2). Appellant's

counsel was conducting cross-examination of Laura MacPherson, a

teller for First N.H. who had witnessed the bank robbery.

MacPherson testified that while she was being questioned by

police at the scene of the crime, an officer was taking notes

based on what she was saying. Appellant's counsel then called

for a sidebar requesting that the Government turn over these

notes pursuant to the Jencks Act:

-13-

Court: It isn't [Jencks] unless she's
seen it and adopted it.

Counsel: But if 18 3500 controls [18
U.S.C. 3500], as I read it, a statement
that is taken down by anybody, she
doesn't have to adopt it. If it's a
written statement taken down by a person
dealing with the subject matter in
question, I'm entitled to it. And I
refer to 18 3500(e)(2).

Government: As I understand the
application of the cited rule under
Jencks, what counsel is referring to
under (e)(2) is a mechanical recording or
a transcription of a recording of some
kind, either stenographic, mechanical,
electrical, or other recording or
transcription of that recording; that is,
a transcript. There is no such material
as the statement is defined under Jencks
as I read the statute in that rule.

Court: That was my understanding of the
interpretation of the statute, sir, and
there are none of those stenographic
recordings [or] transcriptions.

Tr. (October 8, 1992) at 118, 121-22.

While the Government attorney mentioned "other

recording," it is clear from a reading of the entire interchange

that the court and Government attorney disagreed with counsel's

argument that subsection (e)(2) of the Jencks Act encompasses

oral statements made by witnesses that are written down by

government agents as they are taking notes on the conversation,

so long as such statements are substantially verbatim accounts.

Further, the trial record is replete with statements by the court

indicating that it viewed subsections (e)(1) and (e)(2) as

limited to statements that are either adopted by a witness or

-14-

recorded through stenographic or some kind of mechanical means.5

This legal basis, cited as the ground for many of the

court's Jencks Act rulings, is erroneous. Since 1959, the United

States Supreme Court has held that the phrase "other recording"

in subsection (e)(2) "was meant to encompass more than mere

automatic reproductions of oral statements." Palermo v. United

States, 360 U.S. 343, 352 (1959); 18 U.S.C. 3500(e)(2).

Following the Supreme Court's lead, this Court has stated that

"[a] longhand writing which the court found fairly followed the

witness' words, subject to minor, inconsequential errors" would

fall within (e)(2). Campbell v. United States, 296 F.2d 527, 532

(1st Cir. 1961), on remand, 199 F. Supp. 905 (D. Mass. 1961), and

supplemental op., 303 F.2d 747 (1st Cir. 1962), vacated on other

grounds, 373 U.S. 487 (1963)(Campbell II); see also Campbell v.

United States, 365 U.S. 85 (1961)(Campbell I)(finding that typed

interview report prepared by FBI agent based on notes taken

during a pretrial meeting with a government witness may qualify

as Jencks Act statements under subsection (e)(1), if it was

adopted by the witness, or subsection (e)(2), if the report

closely followed notes that included verbatim statements); United

States v. Harris, 543 F.2d 1247, 1250 (9th

Cir. 1976)("handwritten or rough interview notes taken by a

government agent during a criminal investigation" may contain

5 See Appendix I for examples of various Jencks Act rulings by

the court that were, or could possibly have been, based on an
erroneous legal ground. The examples in this Appendix are not
meant to be exhaustive but only to point out on remand the more
obvious rulings that were arguably based on legal error.

-15-

substantially verbatim recitals of witness statements producible

under the Jencks Act). The Supreme Court has indicated, however,

that Congress intended to limit subsection (e)(2) to:

only those statements which could
properly be called the witness' own
words . . . . It [is] important that the
statement could fairly be deemed to
reflect fully and without distortion what
had been said to the government agent.6

Id. at 352-53.

6 The remaining portion of this quotation in Palermo is worth

citing here to provide the court below with guidance, on remand,
in determining whether the disputed statements fall under
subsection (e)(2) of the Act:

Distortion can be a product of
selectivity as well as the conscious or
inadvertent infusion of the recorder's
opinions or impressions. It is clear
from the continuous congressional
emphasis on 'substantially verbatim
recital,' and 'continuous, narrative
statements, made by the witness recorded
verbatim, or nearly so . . .' that the
legislation was designed to eliminate the
danger of distortion and
misrepresentation inherent in a report
which merely selects portions, albeit
accurately, from a lengthy oral recital.
Quoting out of context is one of the most
frequent and powerful modes of
misquotation. We think it consistent
with this legislative history, and with
the generally restrictive terms of the
statutory provision, to require that
summaries of an oral statement which
evidence substantial selection of
material, or which were prepared after
the interview without the aid of complete
notes, and hence rest on the memory of
the agent, are not to be produced.
Neither, of course, are statements which
contain the agent's interpretations or
impressions.

Palermo, 360 U.S. at 352-53.

-16-

In United States v. Newton, 891 F.2d 944, 953-54 (1st

Cir. 1989), this Court rejected an argument that the district

court erred by not conducting an inquiry into whether disputed

notes were "substantially verbatim" statements by the witness

pursuant to 18 U.S.C. 3500(e)(2). We rejected the argument on

two grounds: first because Appellant failed to make a motion on

the basis of that subsection to the court below and, second,

there was no testimony in the record to indicate that "the agent

[had been] recording the exact words of the witness." Id. at

954. In this case, however, Appellant's counsel elicited from a

number of witnesses that agents had been taking notes as the

witnesses were making statements; at sidebars, counsel

specifically cited (e)(2) as the basis for his Jencks Act

motions; and he registered, on the record, his disagreement with

the court's and the Government's interpretation of the statute.

Appellant clearly raised this issue to the court below

and on appeal. After examining the record, we find that the

district judge likely ruled against a number of Appellant's

Jencks Act requests on an erroneous legal ground.7 Rather than

7 In all honesty, this Court has not always been as clear as it
should have been in pointing out the distinctions between 18
U.S.C. 3500 (e)(1) and (e)(2). In United States v. Sep lveda,

15 F.3d 1161, 1179 (1st Cir. 1993), this Court indicated that to
be discoverable under the Jencks Act, a statement must be
"substantially a verbatim account" and "signed or otherwise

verified by the witness himself." The statements in question
satisfied neither requirement. It is clear from a reading of the
authorities cited in Sep lveda, however, that this Court

interprets the Jencks Act as requiring either a showing that the

statement is a substantially verbatim account or that it was

adopted by the witness. See, e.g., United States v. Newton, 891

F.2d 944, 953-54 (1st Cir. 1989)(concerning statement that

-17-

vacate the court's Jencks Act rulings, we choose to remand the

case for the limited purpose of the taking of additional evidence

while retaining appellate jurisdiction in the interim. We have

previously noted the usefulness of such a limited remand, see

United States v. Levy, 897 F.2d 596, 599 (1st Cir. 1990)

(endorsing limited remand for purposes of clarification where

ambiguities lurk in the sentencing record), and have employed the

practice in several cases. See, e.g., U.S. v. Qui ones, No. 93-

1601, slip op. at 16-17 (1st Cir. May 20, 1994)(remanding for

evidentiary hearing to determine whether sentencing departure was

warranted while retaining appellate jurisdiction); United States

v. Parra-Iba ez, 936 F.2d 588, 598 (1st Cir. 1991)(remanding for

evidentiary hearing to determine whether error during Rule 11

colloquy was harmless while retaining appellate jurisdiction),

remanded, 951 F.2d 21 (1st Cir. 1991).

On remand, the district court should hold an

evidentiary hearing and report its findings back to us within

ninety (90) days. The hearing should be limited to determining

whether Appellant Flynn's motions for production, which were

denied on the basis of the erroneous legal ground identified in

this opinion, should have been granted, and documents produced,

under the Jencks Act. We intimate no view on whether disclosure

of any of these materials was required. The district court

arguably fell under 18 U.S.C. 3500(e)(2)); United States v.

Gonz lez-S nchez, 825 F.2d 572, 586-87 (1st Cir.), cert. denied,

Latorre v. United States, 484 U.S. 989 (1987)(concerning

statement that arguably fell under 18 U.S.C. 3500(e)(1)).

-18-

should conduct this hearing, applying the legal standards

articulated in this opinion and limited to examining whether the

disputed materials contain substantially verbatim recitals of

witness statements as defined under subsection (e)(2). If the

court determines that the materials in question do not contain

producible statements or that the nondisclosure of certain

statements, while legal error, was harmless, it should supplement

the record by setting forth its findings and explaining why a new

trial is not required. If, on the other hand, the court

concludes that the Government should have been required to

deliver certain materials, or portions of materials, pursuant to

subsection (e)(2), and that the error of nondisclosure was not

harmless, it should vacate the judgment of conviction and grant

Appellant Flynn a new trial.

II. THE COURT'S ORDER OF $266,500

IN RESTITUTION AGAINST APPELLANT NEAL

Appellant Neal alone challenges the court's restitution

order of $266,5008 to First N.H. pursuant to the Victim and

Witness Protection Act ("VWPA"), 18 U.S.C. 3663, 3664. He

argues that the district court erred, as a matter of law, by

ordering him to pay full restitution of First N.H.'s losses from

the robbery when those losses were not fully attributable to his

offenses of being an accessory after the fact and money

laundering. We review this claim of legal error de novo. See

United States v. Savoie, 985 F.2d 612, 618 (1st Cir. 1993).

8 Appellants Flynn and Kenney were also ordered to pay
restitution to First N.H. in the amount of $266,500.

-19-

In cases where a defendant has been convicted of

specific federal offenses, section 3663 of the VWPA authorizes a

sentencing court to order, "in addition to or . . . in lieu of

any other penalty authorized by law, that the defendant make

restitution to any victim of such offense." 18 U.S.C. 3663(a).

The following section, 18 U.S.C. 3664(a), directs the court to

consider a number of factors, including loss sustained by the

victim as a result of the offense, in determining the amount of

restitution to be ordered against a defendant.9 In Hughey v.

United States, 495 U.S. 411, 413 (1990), the United States

Supreme Court interpreted these provisions as setting a maximum

limit whereby restitutionary awards under the VWPA are not to

exceed "the loss caused by the specific conduct that is the basis

of the offense of conviction."

In objecting to the restitutionary award in proceedings

below, Neal argued that he was compensated no more than $5000 by

the armed robbers for assisting them in evading law enforcement

officials and laundered about $14,000 of the robbery proceeds by

purchasing a getaway vehicle that was later confiscated by the

Government. In an order dated February 22, 1993, the district

9 18 U.S.C. 3664(a) directs the court to consider the
following factors:

. . . the amount of the loss sustained
by any victim as a result of the offense,
the financial resources of the defendant,
the financial needs and earning ability
of the defendant and the defendant's
dependents, and such other factors as the
court deems appropriate.

-20-

court summarily dismissed Neal's argument that he should not be

required to make restitution in an amount greater than the

proceeds that he personally obtained from the robbery. Order

(Docket No. 302) at 3-4. While the court was correct in its view

that the VWPA does not require restitutionary awards to be

limited to the amount obtained by the defendant, the record gives

no indication of whether the court calculated, pursuant to

Hughey, the portion of First N.H.'s losses that were actually

caused by the specific criminal conduct forming the basis for

Neal's convictions.

The VWPA, itself, does not require the court to make

explicit findings to justify restitutionary awards. This Court

has held "that a district judge need not make open-court findings

on the statutory factors when issuing a restitution order so long

as the record on appeal reveals that the judge made implicit

findings or otherwise adequately evinced his consideration of

those factors." Savoie, 985 F.2d at 618. The record here

indicates that the court ordered the same restitutionary amounts

of $266,500 against Appellants Neal, Kenney, and Flynn. The

record also indicates that in connection with the bank robbery,

Kenney and Flynn were convicted of conspiracy to rob First N.H.,

conspiracy and interference with commerce by threats or violence

in violation of the Hobbs Act, and the use of firearms during

crimes of violence. Kenney was also convicted for possession of

a firearm by a convicted felon in committing the bank robbery,

and Flynn was convicted of money laundering. In comparison with

-21-

Flynn and Kenney, Neal was convicted of being an accessory after

the fact and money laundering. Given these factors indicating

the disparate nature of Neal's criminal conduct, there is not an

adequate basis in the record to determine whether the district

judge found that the full amount of losses suffered by First N.H.

was "caused by the specific conduct that [was] the basis of"

Neal's convictions. Hughey, 495 U.S. at 413.

Such a determination was required in this case even

though Congress amended certain provisions of the VWPA soon after

the Hughey decision as part of the Crime Control Act of 1990.

See Pub. L. No. 101-647, 2509, 104 Stat. 4789, 4863 (1990).

One of the amended subsections, codified at 18 U.S.C. section

3663(a)(2), expanded the definition of "victim" for purposes of

restitution, providing in pertinent part that:

a victim of an offense that involves as

an element a scheme, a conspiracy, or a

pattern of criminal activity means any
person directly harmed by the defendant's
criminal conduct in the course of the
scheme, conspiracy, or pattern.

18 U.S.C. section 3663(a)(2)(emphasis added). This broadening of

the definition of "victim" appears to apply to cases involving

mail fraud, racketeering, or other federal crimes that require

proof of a scheme, conspiracy, or pattern of criminal conduct.

This Court faced such a case in U.S. v. Cronin, 990 F.2d 663 (1st

Cir. 1993) and decided that where defendants had committed

various mail fraud offenses prior to enactment of section

3663(a)(2), restitution should be limited to the amounts alleged

in the specific counts on which each defendant was found guilty

-22-

and not awarded for the full amount of losses stemming from the

mail fraud scheme of which each defendant was a part.

While the bank robbery alleged in the indictment in

this case occurred subsequent to the VWPA amendments, section

3663(a)(2) does not appear to support the restitutionary award

entered against Appellant Neal. Neal was convicted of money

laundering and of being an accessory after the fact. Neither of

these offenses involves proof of a scheme, conspiracy or pattern

of criminal activity as an element. See 18 U.S.C. section 1956

(laundering of monetary instruments) and 18 U.S.C. section 3

(accessory after the fact).

Accordingly, we remand the case with instructions that

the court hold a hearing to determine whether the full amount of

damages suffered by First N.H. are attributable to the conduct

underlying Appellant's convictions.10 We leave the dimensions

of the hearing, as well as the necessity vel non for taking

additional evidence, in the sound discretion of the district

court. Similar to the limited remand that we ordered with

respect to Appellant Flynn's Jencks Act challenge, see pp. 16-17

10 We do not mean to suggest that on remand there is no possible
basis for holding Neal accountable for the full amount of losses
suffered by First N.H. We are only suggesting that the record,
as it stands, does not indicate whether, and upon what
evidentiary basis, the trial judge determined that the full
amount of losses are attributable to Neal's criminal conduct. If
on remand, for example, evidence is presented indicating that
Neal played a significant role in helping the other defendants
escape and that but for his actions, there was a substantial
likelihood that the full proceeds would have been recovered, the
court could well be within its statutory authority in imposing
the full $266,500 in restitution.

-23-

supra, we will retain appellate jurisdiction and order the court

to report its findings to us within ninety (90) days. If the

court determines that the full amount of First N.H.'s damages

were caused by Appellant's criminal conduct, it should supplement

the record with these findings. If the court concludes that the

full restitutionary award is not supported by facts presented at

the evidentiary hearing, it should vacate the award and enter a

new restitutionary order based upon a determination of that

amount of damages suffered by First N.H. which is attributable to

the conduct underlying Appellant's convictions.

III. JOINT CHALLENGES

A. The Court's Failure to Define Reasonable Doubt

Appellants Flynn, Kenney, and Neal argue that the

court's jury instructions, which failed to define the term

"reasonable doubt" and used the phrase "by medium of admissible

evidence,"11 violated their due-process rights to a fair trial

and undermined confidence that their convictions rested upon

proof comporting with the constitutional minimum.

This Court has clearly held that "an instruction which

11 The district court judge used this phrase in the following
context:

The law in the United States of America
presumes each defendant to be innocent of
crime, and this presumption of innocence
can be overcome only when the government,
by medium of admissible evidence,

satisfies its burden of convincing the
jurors beyond a reasonable doubt of the
guilt of each defendant as to every
element of the offense with which that
defendant has been charged.

-24-

uses the words reasonable doubt without further definition

adequately apprises the jury of the proper burden of proof," so

long as the phrase is not buried as an aside. United States v.

Olmstead, 832 F.2d 642, 646 (1st Cir. 1987), cert. denied, 486

U.S. 1009 (1988). This Court is satisfied that the instructions

rendered in this case fully satisfy constitutional requirements

and comply with Olmstead.12 The judge reiterated the

12 In addition to the instructions listed in n.11, supra, the

court further instructed the jury as follows:

Moreover, the law never imposes upon a
defendant the burden or duty of
testifying or producing any evidence, so
a reasonable doubt may arise not only
from the evidence produced but also from
a lack of evidence. The government must
prove beyond a reasonable doubt as to
each defendant every essential element of
the offense with which that defendant is
charged. Each defendant has the right to
rely upon the failure of the prosecution
to establish such proof, and each
defendant may also rely upon evidence
brought out on cross-examination of
witnesses presented by the prosecution.

The court then concluded its instructions as follows:

To sum up then, you should treat each
charge made with respect to each
defendant separately and give to each of
such charges the same careful and
thorough consideration you would wish to
have given to each of you were you
charged with the offenses set forth in
this indictment. As I have indicated to
you, the burden in each instance which is
placed upon the government is to prove
each element of the offenses with which
each defendant is charged beyond a
reasonable doubt, and in the event the
government fails to sustain its burden of
proof beyond a reasonable doubt as to any
essential element of any offense charged

-25-

government's burden of proof a number of times; explained that

the government must satisfy this burden with respect to each

element of the offense with which each defendant is charged; and

told the jurors to consider the evidence separately and

impartially against each defendant. See n.12, supra. When read

in context, the phrase "by medium of admissible evidence" would

be interpreted by a reasonable juror to mean that the government

must satisfy its burden of proof through admissible evidence.13

against each defendant, it has failed in
its burden of proof as to each defendant
and that defendant is to be
acquitted. . . . So, if any reasonable
doubt remains in your minds as to the
guilt of any defendant after impartial
consideration of all of the evidence with
respect to such defendant, it is your
duty to find that defendant not guilty.
You should analyze what the evidence in
the case shows with respect to each
element of each offense charged against
each defendant and determine the issue as
to whether the government has sustained
its burden of proof with respect to each
such element.

13 The first definition of "medium" found in Webster's
dictionary is "something in a middle position" or "a middle
condition or degree." The second definition is "a means of
effecting or conveying something." Webster's Ninth New

Collegiate Dictionary (1987).

Appellants argue that the trial court's instructions led
jurors to interpret "medium" along the lines of the first
definition. We note that during the Rule 30 sidebar regarding
objections to the instructions, Appellants did not request that
the district court clarify the sense in which it used the word
"medium." In addition, we find that a reasonable juror would
have interpreted "medium" in accordance with the second
definition where the judge used "beyond a reasonable doubt" in
the same sentence and made clear that the latter standard
represented the Government's burden of proof:

this presumption of innocence can be

-26-

Appellants ask the Court to reconsider its holding in

Olmstead in light of recent Supreme Court decisions. The

opinions cited by Appellants, however, do nothing more than

provide support for Olmstead. The cases all involve judicial

attempts to define reasonable doubt and recognize that attempts

to imbue the phrase with exact definition are fraught with

pitfalls. See, e.g., Victor v. Nebraska, 114 S. Ct. 1239

(1994)(holding that instructions, taken as a whole, correctly

conveyed the concept of reasonable doubt despite the use of such

terms as "moral evidence", "moral certainty," and "substantial

doubt"); Sullivan v. Louisiana, 113 S. Ct. 2078 (1993)(holding

that a constitutionally deficient instruction defining reasonable

doubt cannot be harmless error); Cage v. Louisiana, 498 U.S. 39,

41 (1990)(holding that a defendant's due-process rights were

violated where a judge instructed jurors that reasonable doubt

was equivalent to a "grave uncertainty" and an "actual

substantial doubt" and that jurors could convict if morally

certain of a defendant's guilt).

In Victor v. Nebraska, 114 S. Ct. at 1248, Justice

O'Connor noted that the court did not condone the use of such

terms as "moral certainty" in defining reasonable doubt but went

on to find that the instructions placed the terms in a context

overcome only when the government, by
medium of admissible evidence, satisfies
its burden of convincing the jurors
beyond a reasonable doubt of the guilt of
each defendant as to every element of the
offense with which that defendant has
been charged.

-27-

correctly conveying the quantum of proof necessary for a finding

of guilt. She also noted that:

[T]he Constitution neither prohibits
trial courts from defining reasonable
doubt nor requires them to do so as a
matter of course (citation omitted).
Indeed, so long as the court instructs
the jury on the necessity that the
defendant's guilt be proven beyond a
reasonable doubt, (citation omitted), the
Constitution does not require that any
particular form of words be used in
advising the jury of the government's
burden of proof (citation omitted).

Victor, 114 S. Ct. at 1243.

Because we find that nothing in the Supreme Court cases

cited by Appellants brings into question the holding in the

Olmstead case, we affirm the district court's instructions.

B. Sufficiency of Evidence Supporting Guilty Verdicts

of Flynn and Kenney on Counts Involving the Dress Barn Robbery

Appellants Flynn and Kenney challenge the sufficiency

of the evidence supporting their guilty verdicts on Counts 10,

11, and 22, involving the robbery of a Dress Barn employee while

she attempted to deposit about $763 into a night deposit box.

Counts 10 and 11 alleged that Flynn and Kenney conspired and

interfered with commerce by threats or violence in committing the

Dress Barn robbery in violation of the Hobbs Act, 18 U.S.C.

1951. Count 22 involved the use and carriage of a firearm

during and in relation to a crime of violence, in violation of 18

U.S.C. 924(c)(1).

In reviewing a sufficiency-of-the-evidence claim, the

Court must view the facts in the light most favorable to the

-28-

Government, deferring to the jury's verdict if the evidence can

support varying interpretations, at least one of which is

consistent with the defendant's guilt. United States v. Browne,

891 F.2d 389, 393 (1st Cir. 1989). Viewed in this light, the

evidence must be of such a quantum that a reasonable trier of

fact could find guilt beyond a reasonable doubt but the evidence

need not compel such a finding. Id.

As the basis for their challenge, Appellants point

primarily to inconsistencies in identification testimony between

the bank employee and co-conspirator Thomas McQueeny. The bank

employee testified that the robber was wearing a white styrofoam

woodworker's mask that stood out from his face and that he was

wearing a Patagonia jacket and a pair of jeans. McQueeney, on

the other hand, indicated that Kenney was wearing a white

painter's mask made of cloth and a blue runner's suit.14

Viewed in the light most favorable to the Government,

the identification testimony supports the jury's guilty verdict.

14 The remaining evidence consisted of additional testimony by
McQueeny who stated that he and Flynn watched Kenney try on a
white cloth painter's mask and that, at Flynn's request, he
dropped Kenney off near First National Bank on the night of the
robbery carrying a bag with the mask, the gun, and the gloves.
He also testified about an argument the next morning during which
Flynn scolded Kenney for robbing women with only $600. The
employee was unable to identify Kenney but was able to testify to
his approximate height and age. She also testified that he
carried a handgun similar to the semi-automatic admitted by the
Government as Exhibit 42 and that the stolen proceeds belonged to
a business involved in interstate commerce. Co-conspirator Brian
Raineri testified, indicating that he had discussions with Flynn
on how to rob night depositories, and co-conspirator Richard
Ferguson testified that Kenney later admitted to robbing a couple
of night depositories.

-29-

McQueeney indicated that he dropped Kenney off with a white

painter's mask and a gun near the scene of the robbery; the

employee testified that her assailant was wearing a white

carpenter's mask and carrying a gun similar to Government Exhibit

42. McQueeney also supplied evidence of conspiracy, testifying

that Flynn watched as Kenney tried on the mask, directed

McQueeney to drop Kenney off near First National Bank, and argued

with Kenney the following morning for targeting women with only

$600. Kenney later admitted to co-conspirator Ferguson that he

robbed some night depositories. While the evidence may not

compel guilty verdicts, this Court finds that it is of a

sufficient quantum that a reasonable trier of fact could find

Appellants guilty beyond a reasonable doubt on the counts

involving the Dress Barn robbery. Hence, the Court affirms

Flynn's and Kenney's convictions on Counts 10, 11, and 22.

C. The Court's Denial of Flynn's and Kenney's

Motions to Set Aside Verdicts and to Grant New Trial

Appellants Flynn and Kenney argue that the district

court abused its discretion by denying their motions to set aside

verdicts and to grant a new trial, arguing that joinder of

charges against them resulted in prejudice, pursuant to Fed. R.

Crim. P. 14.15 Appellants argue that joinder was initially

15 Fed. R. Crim. P. 14 provides in relevant part:

If it appears that a defendant or the
government is prejudiced by a joinder of
offenses or of defendants in an
indictment or information or by such
joinder for trial together, the court may
order an election of separate trials of

-30-

proper but became prejudicial when the district court dismissed

the RICO counts at the close of the Government's case for failure

to establish a pattern of racketeering activity. Assuming that

initial joinder was proper under Fed. R. Crim. P. 8(b),16 the

district court has considerable latitude in treating motions

based on prejudicial joinder under Rule 14, and "its resolution

of severance questions will be overturned only if that wide

discretion is plainly abused." United States v. Natanel, 938

F.2d 302, 308 (1st Cir. 1991), cert. denied, 112 S. Ct. 986

(1992); see also United States v. McLaughlin, 957 F.2d 12, 18

counts, grant a severance of defendants
or provide whatever other relief justice
requires . . . .

16 Because Appellants do not argue that initial joinder was
improper and did not move for severance of offenses or defendants
before trial, their appeal does not implicate Fed. R. Crim. P.
8(b). See Appellant Kenney's Brief at 27 (stating that joinder

in the present case was proper at the commencement of trial).
Fed. R. Crim. P. 8(b) provides:

Joinder of Defendants. Two or more
Joinder of Defendants.
defendants may be charged in the same
indictment or information if they are
alleged to have participated in the same
act or transaction or in the same series
of acts or transactions constituting an
offense or offenses. Such defendants may
be charged in one or more counts together
or separately and all of the defendants
need not be charged in each count.

The Court will note only that initial joinder is generally
held to be proper where, as here, the indictment includes RICO
counts that link all defendants to the conspiracy, United States

v. Zannino, 895 F.2d 1, 16 (1st Cir. 1990), cert. denied, 494

U.S. 1082 (1990), and "[embrace] all of the acts and transactions
upon which the other . . . counts [are] based." United States v.

Boylan, 898 F.2d 230, 245 (1st Cir. 1990), cert. denied, 498 U.S.

849 (1990)(quoting United States v. Tashjian, 660 F.2d 829, 833

(1st Cir.), cert. denied, 454 U.S. 1102 (1981)).

-31-

(1st Cir. 1992)("We review a trial court's denial of a severance

motion for abuse of discretion and reverse only if denial

deprived defendant of a fair trial, resulting in a miscarriage of

justice").

When severance has been refused, appellants shoulder

the burden of making a strong showing of prejudice that the

joinder of offenses or defendants served to deprive them of a

fair trial. Id; Natanel, 938 F.2d at 308 (citing United States

v. Porter, 764 F.2d 1, 12 (1st Cir. 1985)). Appellants argue

that prejudice resulted because the jury was exposed to certain

evidence that would otherwise have been inadmissible against them

without the RICO counts. They specifically point to testimony by

officials of the New Hampshire State Police who observed them on

numerous occasions surveilling armored trucks in preparation for

the First N.H. robbery. Appellants argue that this testimony

would not have been admitted but for the RICO counts and that it

prejudiced the jury in considering the remaining counts against

them. The admissibility of the surveillance testimony, however,

was not limited to the RICO counts, as Appellants argue, but was

relevant to Counts 3, 4, 5, 16, 17, 18, and 19, involving

conspiracy to commit bank robbery and other bank robbery charges.

Appellants also give no clear indication, other than conclusory

statements, of how this surveillance testimony was so material

and significant as to make a prejudicial finding likely on other

unrelated counts.

Appellants make a more general "spillover" argument,

-32-

asserting that evidence admitted at trial relating to the whole

series of robberies linked by the RICO counts made it impossible

for the jury to consider each defendant and each offense

separately. "There is always some prejudice in any trial where

more than one offense or offender are tried together -- but such

'garden variety' prejudice, in and of itself, will not suffice."

United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990).

Here, the district court sought to minimize the possibility of

prejudice by giving limiting instructions in the course of trial

and instructing the jury at the beginning and end of the closing

charge to consider the evidence against each defendant separately

with respect to each count of the indictment. See nn. 11 & 12

supra. That the jury was able to follow these instructions is

demonstrated by its selective verdict,17 which provides

"reasonably good assurance that no injurious spillover effect

occurred." Natanel, 938 F.2d at 308. The Court also notes that

evidence at trial was presented in a compartmentalized fashion to

assist the jury in distinguishing between the various crimes and

defendants; i.e., the first fifteen days of trial covered the

First N.H. robbery while successive days treated each of the

other predicate acts in turn.

Finding no abuse of discretion, the Court affirms the

17 The jury found Appellants not guilty on Counts 8, 9 and 21,
involving the night deposit robbery of a restaurant employee, but
guilty on counts involving the five remaining robberies. Finding
Appellant Neal guilty of money laundering and accessory after the
fact, the jury found him not guilty of conspiracy to rob First
N.H.

-33-

trial court's denial of Appellants' motions to set aside the

verdicts and for a new trial.

IV. CHALLENGES RAISED SEPARATELY BY FLYNN

A. The Court's Denial of Motion for Continuance

Appellant Flynn challenges the court's denial of his

motion for continuance of trial to enable him to seek retained

counsel, filed on September 25, 1992, as well as the court's

refusal of his motion to reconsider, filed on the first day of

trial, October 5, 1992. This Court will review the denial of

Flynn's motion for abuse of discretion. United States v. Machor,

879 F.2d 945, 952 (1st Cir. 1989), cert. denied, 493 U.S. 1081,

1094 (1990).

The record indicates that Flynn first requested, and

was granted, the right to seek retained counsel on May 28, 1992,

after withdrawing his motion to represent himself pro se. Flynn

failed to retain counsel in the time allotted and on June 18,

appeared before a magistrate judge in a hearing on the

Government's motion to have counsel appointed for him. Flynn

told the magistrate that he still desired to seek retained

counsel and mentioned the names of two possible lawyers. The

magistrate granted the Government's motion and appointed as

Flynn's counsel Attorney Lawrence Gillis, who entered his

appearance on July 6, 1992. This action by the court in no way

interfered with Flynn's continued efforts to retain outside

counsel.

On September 1, 1992, the district court granted

-34-

Flynn's motion for continuance of trial, giving him one deadline,

which lapsed, and extending it again until September 18 to enable

Flynn to retain private counsel.18 Five days after the

deadline, on September 23, Attorney Barry Wilson filed a motion

to enter his appearance as Flynn's counsel and, on September 25,

filed a motion to continue the October trial date until January

of 1993, to give him time to prepare for trial. The district

court denied the September 25 motion as well as a motion, filed

on the first day of trial, to reconsider its ruling, finding

that:

Flynn's maneuvers with respect to counsel
are such as to equate with a waiver of
his right to choose counsel. . . . The
court fully understands the difficulties
imposed on Attorney Gillis by Mr. Flynn's
refusal to date to cooperate with him,
but it behooves Mr. Flynn to now sit down
with his appointed counsel and to assist
him in the presentation of his defenses.

September 28, 1992, Order (Docket No. 187) at 3-4. Trial

continued as scheduled, beginning on October 5, 1992, except that

Attorney Gillis withdrew and Attorney Wilson took over as Flynn's

retained counsel.

The Sixth Amendment guarantees a defendant the right to

assistance of counsel, which includes the right to counsel of

one's choice. United States v. Hallock, 941 F.2d 36, 44 (1st

Cir. 1991). While the right to effective assistance is absolute,

18 Flynn's motion was based on an affidavit filed by Gillis
alleging a total breakdown in communication with his client
because Flynn refused to cooperate with him in preparing a
defense.

-35-

this Court has long held that a defendant's right to choose a

particular counsel must be weighed against administration-of-

justice concerns and "cannot be insisted upon in a manner that

will obstruct reasonable and orderly court procedure." United

States v. Poulack, 556 F.2d 83, 86 (1st Cir.), cert. denied, 434

U.S. 986 (1977); see also Hallock, 941 F.2d at 44; Machor, 879

F.2d at 952; Tuitt v. Fair, 822 F.2d 166 (1st Cir.), cert.

denied, 484 U.S. 945 (1987).

In light of these factors, this Court does not find

that the district court abused its discretion in denying Flynn's

motion for continuance. In essence, Flynn had nearly four months

to secure private counsel -- from May 28, 1992, until September

18, 1992. The trial date was continued for one month at his

behest; yet he continually failed to meet deadlines set by the

court. Given these circumstances, the Court affirms the denial

of Flynn's belated September 25 motion for continuance and his

later motion to reconsider.19

B. The Court's Admission of Bank Employee's

Testimony and Its Denial of Appellant's Motion

for Judgment of Acquittal on Bank Robbery Counts

Appellant argues that the district court improperly

admitted the testimony of bank employee Debbie Haskins, who

testified with respect to First N.H.'s federally insured status

and its involvement in interstate commerce. Appellant also

challenges the sufficiency of the evidence in support of the

19 The Court notes that while Flynn's belated motion for
continuance was denied, Attorney Wilson still conducted his
representation at trial.

-36-

jury's guilty verdicts on the bank robbery counts.

Appellant first argues that Haskins' testimony should

not have been admitted because she lacked personal knowledge of

the bank's FDIC status or its involvement in interstate commerce

as required by Fed. R. Evid. 602 (witness may not testify to a

matter without evidence that she had "personal knowledge of the

matter"). In particular, Appellant argues that Haskins, who

worked as an insurance compliance specialist for First N.H., did

not commence her employment until a month after the robbery, so

her testimony was based on records that she was exposed to in the

course of her later employment and not on knowledge formed at the

time of the robbery.

Evidence is inadmissible under Rule 602 "only if in the

proper exercise of the trial court's discretion it finds that the

witness could not have actually perceived or observed that which

he testified to." Hallquist v. Local 276, Plumbers & Pipefitters

Union, 843 F.2d 18, 24 (1st Cir. 1988). Personal knowledge can

include "inferences and opinions, so long as they are grounded in

personal observation and experience." United States v. Doe, 960

F.2d 221, 223 (1st Cir. 1992). Haskins testified that her job

brought her into contact with records, including certificates

provided by the FDIC, which indicated that the Stratham, New

Hampshire branch of First N.H. was federally insured, although

she had not personally seen such a certificate posted at the

branch on the date of the robbery. She also testified that bank

records to which she was exposed indicated that the branch had

-37-

customers in Vermont and Massachusetts and a correspondent

banking account in Massachusetts. This Court finds that the

district court did not abuse its discretion in admitting Haskins'

testimony because it was limited to information that she actually

perceived or observed as an insurance compliance specialist and

did not attest to circumstances beyond her personal

knowledge.20

Appellant also argues that the guilty verdicts on the

bank robbery counts were not supported by a sufficiency of the

evidence with respect to the elements of FDIC insurance status

and involvement in interstate commerce.21 As the Government

points out, Appellant moved for judgment of acquittal on these

counts on the basis of other arguments and did not argue below

that dismissal should be granted on the above-cited grounds.

Consequently, Appellant has waived this argument on appeal unless

the bank robbery convictions are "clearly and grossly unjust."

United States v. L pez, 709 F.2d 742, 746 (1st Cir.), cert.

20 Appellant's argument that Haskins' knowledge was not formed
on the basis of information that she possessed on the date of the
robbery may have diminished the value of her testimony, but such
an argument does not implicate Rule 602. "'The extent of a
witness' knowledge of matters about which he offers to testify
goes to the weight rather than the admissibility of the
testimony.'" Hallquist, 843 F.2d at 24 (quoting Nielson v.

Armstrong Rubber Co., 570 F.2d 272, 277 (8th Cir. 1978)).

21 Proof beyond a reasonable doubt that the Federal Deposit
Insurance Corporation insured the deposits of First N.H. is an
essential element of the crimes alleged in Counts 3, 4, and 5,
regarding the robbery of First N.H. in violation of 18 U.S.C.
2113. Proof beyond a reasonable doubt that robbery of First
N.H. had some effect on interstate commerce is an essential
element of the Hobbs Act violations alleged in Counts 16, 17, and
18. 18 U.S.C. 1951.

-38-

denied, 464 U.S. 861 (1983).

Even under the less rigorous standard governing

sufficiency-of-the-evidence claims, however, we affirm the

convictions. The evidence, viewed in the light most favorable to

the Government, could have persuaded a rational trier of fact

beyond a reasonable doubt that First N.H. was FDIC-insured and

involved in interstate commerce.22 Hence, the district court's

denial of Flynn's motion for acquittal on the bank robbery counts

is affirmed.

C. The Court's Denial of Motion to Sever Count 19

Charging Possession of Firearm by Convicted Felon

Appellant challenges the district court's denial of his

motion to sever Count 19 as an abuse of discretion, arguing that

the inclusion of his prior felony history resulted in clear

prejudice and denied him a fair trial. Appellant moved for

severance under Fed. R. Crim P. 14, which provides, in part, that

if it appears a defendant may be prejudiced by joinder of

offenses, the court may "order an election of separate trials of

counts, grant a severance of defendants or provide whatever other

22 In addition to Haskins' testimony, the Government introduced
into evidence a certified copy of the records of the FDIC
establishing that after a diligent search of the agency's
records, no evidence was found to indicate that First N.H.'s
insured status was ever terminated on or before the date of the
September 9, 1991, robbery. Further, Haskins' testimony
regarding First N.H.'s interstate accounts was augmented by the
testimony of another bank employee, Anita Ramsdell, who was in
charge of opening new accounts, teller supervision, and
maintenance of the bank vault. According to Ramsdell, the bank
sold vault money to the Federal Reserve Bank of Boston and on the
morning of the robbery, the vault contained a large amount of
money that was about to be shipped there.

-39-

relief justice requires . . . . " Trial courts are granted

discretion under Rule 14 to take whatever steps are deemed

necessary to minimize prejudice; "[s]everance is only one

remedy -- and certainly the most extreme -- in the federal

courts' remedial arsenal." United States v. Daniels, 770 F.2d

1111, 1120 (D.C. Cir. 1985).

Here the record indicates that in ruling on Flynn's

motion on the first day of trial, the court declined severance

but decided not to disclose the details of Flynn's prior

conviction(s) in reading Count 19 to the jury. Flynn's counsel

later indicated that he would stipulate to his client being a

convicted felon and stipulate that the court could instruct the

jury in that regard. In its final instructions to the jury, the

court indicated that the parties had stipulated to the fact of

the prior conviction(s), without detailing the nature of the

criminal acts at issue in them. The Court finds that the district

court did not abuse its discretion in deciding not to sever Count

19 and in opting instead to limit the jury's exposure to the

details of Flynn's prior criminal history.

D. Statements Made During Prosecutor's Closing Argument

Appellant asserts that the Government prosecutor made

improper comments during his closing argument in which he

allegedly injected his personal opinion and referred to facts

outside the record regarding the truthfulness of Government

witnesses. This Court has long held that a prosecutor may not

place the prestige of the government behind a witness by making

-40-

personal assurances about the witness' credibility nor indicate

that facts not before the jury support the testimony. See, e.g.,

United States v. Martin, 815 F.2d 818, 821-22 (1st Cir. 1987),

cert. denied, 484 U.S. 825 (1987); United States v. Rosa, 705

F.2d 1375, 1379-80 (1st Cir. 1983). Appellant specifically

points to the following comments to support his argument of

prosecutorial misconduct:

Comment 1: Much comment has been made

about deals. It would seem to me that a
17-year stretch in prison isn't much of a
deal.

Comment 2: Believe me. Richard Ferguson

remembers what he remembers. So does
Arthur Cosgro. So does Tom McQueeny. So
does Brian Raineri. So do all the other
witnesses in the case. Sometimes they
don't match with each other. Sometimes
they don't match with other people at the
offenses. And that's fine. They're
telling what they remember. These guys,
as somebody said, are not great abstract
thinkers. I think we can all agree to
that . . . . Which is it? . . . . Do we
know? No, we don't know. We can choose
to believe which of those is accurate or
who remembers better.

Comment 3: These people believe, rightly

or wrongly that they might have had some
criminal exposure. Even if they did, I
think we can all agree its substantially
less than the individuals who are charged
with the crimes in this indictment.

Comment 2 was not the subject of contemporaneous

objection and will be treated first. Absent plain error, the

failure to object during the prosecutor's argument forecloses

appellate review. United States v. Morales-Cartagena, 987 F.2d

849, 854 (1st Cir. 1993)(stating that plain-error standard

-41-

requires reversal of a conviction only if a "miscarriage of

justice would otherwise result"). This Court does not find plain

error. Other than the phrase, "Believe me," which appears to be

an expression of personal opinion only if read out of the total

context, the prosecutor's comment does not improperly vouch for

the credibility of Government witnesses. The comment merely

points out that the witnesses, telling the story as they remember

it, have generated a number of inconsistencies in the record and

that it is up to jury to resolve these issues.23

The Court finds likewise that comment 1 falls within

permissible boundaries. When read in context, the phrase "it

seems to me" does not amount to improper vouching for the

credibility of a Government witness because the comment is

limited to the terms of the plea agreement. "It is not error to

inform a jury of the contents of a plea agreement, nor is it

improper for the government to call attention to a witness'

motivation for testifying." United States v. Dockray, 943 F.2d

152, 156 (1st Cir. 1991).24 Especially here, where the record

23 Even if a contemporaneous objection had been made, comment 2
still does not rise to error sufficient to warrant a new trial.
See, e.g., United States v. Rodr guez-Estrada, 877 F.2d 153 (1st

Cir. 1989)(where prosecutor explicitly assured jury that witness
would tell truth, error not reversible because it was
counterbalanced by other statements of prosecutor telling jurors
there was conflicting evidence on issues testified to by witness
and reminded jury that they should determine issues of demeanor
and credibility).

24 Appellant suggests that this comment misrepresented the plea
agreement of Arthur Cosgro, who testified that the Government
promised to recommend eight years at sentencing. This Court
agrees
with the Government, however, that the comment actually referred

-42-

indicates that defense counsel focused much of their cross-

examination and closing arguments on the benefits to be bestowed

on cooperating co-conspirators, the comment that "a seventeen-

year stretch in prison isn't much of a deal" does not amount to

prosecutorial misconduct. See Martin, 815 F.2d at 822 (finding

no prosecutorial misconduct where prosecutor told jury that each

of the Government witnesses expects to go to jail; "[t]he

Government is going to recommend substantial jail, the maximum

penalty is five years, and even with good time off, five years,

four years in a Federal Penitentiary, that's no walk in the

park").

Appellant argues that in making comment 3, the

prosecutor improperly interjected his personal opinion that

Appellant was guilty and asserted that all other trial witnesses

agreed with the Government's assessment. Appellant's

interpretation of comment 3 is far-fetched. The most this Court

can glean from the comment is that (1) the Government witnesses

were motivated to testify, at least in part, because of the

prospect of criminal prosecution and that (2) their involvement

in the conspiracy, as disclosed by their testimony, when compared

with the conduct alleged against defendants in the indictment,

indicated that the witnesses were less culpable than defendants

in the overall conspiracy. This comment is proper argumentation

based on the evidence before the jury and does not amount to

to the plea agreement of Richard Ferguson, who testified that the
prosecution would recommend seventeen years.

-43-

improper vouching for the credibility of witnesses or a personal

opinion as to the guilt of the defendants.

Finding no evidence of prosecutorial misconduct, we

need not reach the issue of whether the comments in question were

likely to have prejudiced Appellant by altering the outcome of

the case. United States v. Rodr guez-Estrada, 877 F.2d 153, 159

(1st Cir. 1989).

V. CHALLENGES RAISED SEPARATELY BY KENNEY

A. The Court's Denial of Motion to Dismiss

Indictment Under Interstate Agreement on Detainers

Appellant Kenney argues that the district court erred

in refusing to dismiss his indictment under the Interstate

Agreement on Detainers Act, 2, Art. IV, 18 U.S.C. App. ("IAD"

or "Act"). The IAD establishes procedures for transfer of

prisoners incarcerated in one jurisdiction to the temporary

custody of another jurisdiction where criminal charges are

pending. It

sets time limits for trying prisoners transferred under its

provisions, with the purpose of encouraging the "expeditious and

orderly disposition" of outstanding charges. IAD, Art. I.

Kenney argues that the indictment should have been

dismissed based on the following violations of the IAD:

Violation of Art. IV(a), which provides

for a thirty-day period "after receipt by
the appropriate authorities before the
request [for temporary custody] be
honored, within which period the Governor
of the sending State may disapprove the
request for temporary custody or
availability, either upon his own motion
or upon motion of the prisoner";

-44-

Violation of Art. IV(d), which indicates

that the Act does not deprive a prisoner
of any right to contest the legality of
his extradition to the receiving state;

Violation of Art. IV(c), which provides

that "trial shall be commenced within one
hundred and twenty days of the arrival of
the prisoner in the receiving State, but
for good cause shown in open court, the
prisoner or his counsel being present,
the court having jurisdiction of the
matter may grant any necessary or
reasonable continuance."

Kenney failed to raise Articles IV(a) and IV(d) as a basis for

his motion to dismiss below; hence, he has waived those arguments

pursuant to Fed. R. Crim P. 12(b) and 12(f). We have considered

whether these claims constitute plain error and have concluded

that they do not.

Kenney did raise Art. IV(c) on several occasions as a

basis for objecting to motions for continuances filed by co-

defendants and ultimately in a motion to dismiss his indictment,

arguing that the court failed to try him within 120 days of his

appearance in the jurisdiction of New Hampshire. Kenney was

brought to the District of New Hampshire on May 7, 1992, and

trial, pursuant to a strict application of the 120-day deadline,

should have commenced on September 8, 1992.25

In denying Kenney's motion to dismiss, the judge

indicated that continuing the trial until October 5 did not

violate the 120-day provision because the clock had been tolled

for twenty-eight days, from August 4 through August 31, 1992,

25 September 5, 1992, was exactly 120 days, but that date fell
on a holiday weekend.

-45-

while the magistrate judge resolved pretrial motions filed by

Kenney. The judge also ruled that delays attributable to the

disposition of motions filed by other co-defendants constituted

"good cause" under the IAD and were also excluded from the

computation.

This Court has recently suggested that delay caused by

a court's resolution of pending co-defendant motions may qualify

as excludible time under Article IV(c) of the IAD which states,

"for good cause shown in open court . . . the court . . . may

grant any necessary or reasonable continuance." Whiting v. U.S.,

No. 92-1182, slip op. at 29-30 (1st Cir. July 6, 1994). However,

the facts of this case allow us to affirm the court's denial of

Kenney's motion to dismiss on a narrower ground; i.e., that delay

attributable to the disposition of motions filed by the

defendant, himself, is excludible from the 120-day computation.

Art. VI(a) of the IAD provides that the 120-day clock

"shall be tolled whenever and for as long as the prisoner is

unable to stand trial." This Court has generally interpreted

this provision to allow for tolling during the time that it takes

for the court to resolve matters raised by the defendant who is

claiming rights under the IAD. Whiting, No. 92-1182, slip op. at

27-28; United States v. Walker, 924 F.2d 1, 5-6 (1st Cir. 1991),

United States v. Taylor, 861 F.2d 316, 321-22 (1st Cir. 1988).

We have held out the possibility, however, that where a defendant

timely advises the court that he or she is claiming protections

under the IAD and the court takes more time than is necessary to

-46-

resolve the defendant's pretrial motions, then the delay may not

be fully excluded from the 120-day clock.

In this case, Kenney first informed the court on June 5

that he refused to waive any rights under the IAD in response to

a Government motion relating to bail. On August 4, he filed

seven pretrial motions but did not refer to his reliance on the

IAD to notify the magistrate that an expedited decision was,

perhaps, warranted. The Government submitted responses on August

14, and the magistrate ruled on the motions on August 31. Kenney

informed the court that he was specifically relying on the 120-

day trial provision on September 1, when he filed objections to

motions by co-defendants seeking a continuance of the trial date.

In these circumstances, the Court finds that a 28-day

delay in resolving defendant's own motions was not unreasonable

and that after excluding this delay, trial was properly commenced

within the 120-day deadline.26 Accordingly, we affirm the

district court's denial of Kenney's motion to dismiss his

indictment.

B. The Court's Admission into Evidence of Semi-Automatic Handgun

Appellant Kenney challenges the court's admission into

evidence of Government exhibit 42, a .32 caliber semi-automatic

handgun. Specifically, Kenney argues that the Government failed

to introduce sufficient evidence that (1) the gun had not been

26 According to this Court's calculations, the 120-day period,
excluding the twenty-eight-day delay occasioned by defendant, ran
on October 3, 1992, which was a Saturday. Trial was properly
commenced on the first day of the business week, October 5, 1992.

-47-

altered subsequent to the crime and (2) the gun was the actual

gun used in the crimes in question. We need not belabor the

point because we find that the district court did not abuse its

discretion in admitting the handgun.

Federal Rule of Evidence 901(a) requires the trial

court to determine if there is a "reasonable probability" that

the evidence is what it is purported to be. Evidence before the

court indicated that the gun had been stored in a garage for

thirteen days. Even though the garage was used as a storage

facility by several people, testimony at trial indicated that a

co-conspirator's relative retrieved the handgun from the same

place that it had been left by Kenney and Flynn. Considering the

nature of the handgun, circumstances surrounding its

preservation, and the scant likelihood of intermeddlers, the

judge properly determined that it was in substantially the same

condition.

The trial court also did not abuse its discretion in

determining that there was a reasonable probability that the

handgun was the same gun used in the robberies. Three co-

conspirators identified the handgun, and a co-conspirator's

relative identified the case in which the handgun was found and

testified that she heard Flynn tell Kenney to hide the case in

the garage. In addition, testimony by witnesses to the robberies

described a gun matching the Government's exhibit.

-48-

VI. SEPARATE CHALLENGES RAISED BY APPELLANT NEAL

A. Sufficiency of Evidence to Support Guilty Verdict

on Counts Alleging Accessory After The Fact and Money Laundering

Appellant Neal challenges the sufficiency of the

evidence in support of the jury's guilty verdicts on Counts 30

and 31.27 This Court finds that the evidence, viewed in the

light most favorable to the Government, together with all

legitimate inferences, was of such a quantum that a reasonable

trier of fact could find Neal guilty beyond a reasonable doubt on

both counts.28 United States v. Browne, 891 F.2d 389, 393 (1st

27 Count 30, alleging accessory after the fact in violation of
title 18 U.S.C. 3, requires proof beyond a reasonable doubt
that a defendant (1) knew an offense had been committed against
the United States; and (2) "receives, relieves, comforts or
assists the offender in order to hinder or prevent his
apprehension, trial or punishment . . . ."

Count 31, alleging money laundering in violation of title 18
U.S.C. 1956(a)(1)(B)(i), requires proof beyond a reasonable
doubt that a defendant knew that:

the property involved in a financial
transaction represents the proceeds of
some form of unlawful activity [and]
conducts such a financial transaction
which in fact involves the proceeds of
specified unlawful activity, knowing that
the transaction is designed in whole or
in part, to conceal or disguise the
nature, the location, the source, the
ownership, or the control of the proceeds
of specified unlawful activity . . . .

28 The evidence consisted, in part, of testimony indicating that
Neal was at his home on several occasions when co-conspirators
met to discuss the bank robbery and to make final preparations
for committing the crime. The co-conspirators took refuge in
Neal's home immediately following the robbery with a reasonable
inference from the testimony being that Neal opened his cellar
door to let them in. Neal followed Flynn's instructions to "go
out and get the box of money" out of the car, with the box also
containing the gun used in the robbery. Tr. (October 14, 1992)

-49-

Cir. 1989).

B. Court's Denial of Motion for

Downward Adjustment of Base Offense Level

Neal challenges the district court's denial of his

motion for a downward adjustment of his Base Offense Level

pursuant to section 3B1.2(a) of the Sentencing Guidelines.

U.S.S.G. 3B1.2(a). That section of the Guidelines provides for

a four-level reduction where the court determines that a

defendant was a minimal participant in the offense for which he

was convicted and is intended to cover only those defendants who

are clearly the least culpable of those involved in the criminal

conduct of the group. See U.S.S.G. 3B1.2(a), comment nn. 1 &

2. Absent a mistake of law, a district court's finding as to

whether a defendant was a minor or minimal participant will be

reversed only if clearly erroneous. United States v. Brum, 948

F.2d 817 (1st Cir. 1991).

Here, the court's determination was not clearly

erroneous and we affirm. Neal mistakenly refers to the overall

conspiracy encompassing five robberies as the benchmark for

arguing that he played a minimal role. But section 3B1.2 focuses

on the role of a defendant with respect to the offense(s) of

at 40. Neal was given between $2000-$5000 as his split from the
proceeds of the robbery. Flynn later furnished him with
additional money from the robbery to pay off hundreds of dollars
in parking tickets and to purchase a car in his name to be used
by Flynn and Kenney to drive to Arizona and eventually to
California. A friend of Neal's testified that he told her he had
won the money used to purchase the car by betting on football
games and had purchased the car with the intention of letting a
friend use it for a week or so.

-50-

which he was convicted. Here, Neal was convicted of money

laundering and being an accessory after the fact. He was the

only defendant indicted and convicted on the count of being an

accessory after the fact and was indicted and convicted jointly

with Flynn on the money laundering count. The facts support the

court's determination that Neal did not play a minimal role with

respect to the conduct alleged in either count.

VII. CONCLUSION

Accordingly, the Court affirms the district court's

rulings on all issues raised on appeal except the issue raised by

Appellant Flynn regarding the court's denial of various motions

for production of witness statements under the Jencks Act and the

issue raised by Appellant Neal regarding the court's order of

restitution against him. We will retain appellate jurisdiction

to enable us to review the augmented record and the court's

subsequent determinations on the Jencks Act and restitution

claims.

With respect to Appellant Flynn's challenge, we remand

the case for an evidentiary hearing to determine whether

statements were improperly withheld from him during trial in

violation of the Jencks Act and, if so, whether nondisclosure of

such statements constituted harmless error. With respect to

Appellant Neal's challenge, we remand the case so that the court

may determine whether the full amount of damages suffered by

First N.H. was caused by the criminal conduct underlying

Appellant's convictions for money laundering and being an

-51-

accessory after the fact. The court should report its findings

and determinations back to us within ninety (90) days. We will

retain appellate jurisdiction for the time being.

It is so ordered.

-52-

APPENDIX I: LISTING OF JENCKS ACT RULINGS

TO BE RECONSIDERED ON REMAND

Below find examples where the court indicated that it

was denying Jencks Act requests on the ground that there was no

showing that the witness had seen and adopted the statements

pursuant to 18 U.S.C. 3500 (e)(1). The court failed to make

the further inquiry, pursuant to 18 U.S.C. 3500 (e)(2), of

whether the notes or interview reports of government agents,

requested by counsel, contained statements that were

substantially verbatim recitals of a witness' prior statements.

Rulings made pursuant to this erroneous standard include the

following:

(1) After the Government conducted direct examination on
Anita Ramsdell, a teller at First N.H., Appellant's
counsel requested all Jencks material on the witness.
The court indicated:

I looked at it and it's not Jencks
material. . . . But I can't really rule on it
at this point until somebody asks her the
question if she's ever seen it.

Tr. (October 9, 1992) at 6. Cross-examination by
Appellant's counsel indicated that an FBI agent took
notes for a half hour to forty-five minutes while the
witness was being questioned by a detective from the
Stratham police department but she further testified
that she never saw the notes. Id. at 34-37. It is

presumably on this basis, that witness Anita Ramsdell
never saw or adopted the notes, that the court denied
counsel's Jencks request.

(2) While Appellant's counsel was conducting cross-
examination upon Richard Ferguson, a co-conspirator who
pled guilty and cooperated with the Government,
Ferguson testified that he met with Government
attorneys Patrick Walsh and Robert Veiga and someone
from the FBI on at least two different occasions and
that Walsh was probably taking notes. Counsel asked
for a sidebar:

-53-

Counsel: There are four to six hours of
statements that someone took notes on. . . .
I would suggest that there must be some
Jencks material . . . .

Court: So far I can't agree with you,
counsel, but your objection is noted.

Tr. (October 14, 1992) at 140.

On further cross-examination of Ferguson, he testified
that Government attorney Walsh went over the same
things with him in the second interview that were
covered in the first interview. Counsel again asked
for a sidebar requesting that the court order the
Government to turn over materials from the first
interview based on the witness' testimony that he went
over these materials with the Government attorney:

Government: Your Honor, it is not. I mean
all he said so far is that -- as I remember
his testimony -- is that he went over the
same things in each interview.

Court: That is my understanding, but the
objection of the defense is noted.

Counsel: Your Honor, wait a minute.
Unfortunately I must admit I don't understand
what's going on here, but I am trying to
figure it out. Am I to understand that at
some point is work product being interposed
here for the basis of why we are not getting
these materials?
. . . .
Counsel: The reason is that you have been
given documents which you have reviewed, and
within those documents somehow he has never
adopted them, so that's why we don't get
them?

Court: The record before me is that he has
never adopted those documents.
. . . .
Court: If I am wrong I will be reversed.
Your objection is noted.
. . . .
Counsel: I want the record to reflect that
in my opinion what I now understand is that
this is a very clever manipulation of the
rules by the United States Government in the
District of New Hampshire to avoid ever

-54-

giving Jencks material, because what we do is
if we never ask the witness to adopt it, that
if there is no steno present, we can clearly
say there is not Jencks material . . . .

Tr. (October 14, 1992) at 152-53.

(3) The court denied production of Jencks material on
witness Linda Sherouse who worked at the Dress Barn
retail store and was victim of a night deposit robbery.
When Sherouse was testifying on direct examination with
respect to the gun used by the robber, counsel asked
for a side bar:

Counsel: Now I'd like to know where her
Jencks material is. Where's her statements?
Where's a description of this? Where's a
prior statement of this or why hasn't she
been shown this?

Government: She gave a statement at the time
of the incident to the local authorities,
which was Hampton Police Department I guess.
But there has been no Jencks material with
respect to that.
. . . .
Court: Why don't you give him the statement
she made to the Hampton cops.

Government: She hasn't reviewed it. She
hasn't reviewed it. It's not Jencks.

Court: Can I review it?

Government: Sure, certainly.
. . . .
Court: For the record, I have reviewed them
and I don't think there's either Jencks or
Brady material in them.

Tr. (October 27, 1992 -- Afternoon session) at 86-88.

(4) Other examples where the court may have used an
erroneous legal ground in denying Jencks requests
include a request for Jencks material on Douglas
Scamman. Scamman is a dairy farmer who identified
Appellant Flynn in court as one of several men whom he
observed on various occasions loitering near a field
that was allegedly used by the armed robbers to reach
and escape from First N.H. Counsel asked the court to
order production of Jencks or Brady material with
respect to statements made by Scamman that might be

-55-

included in a report filed by a Sergeant Forbes. The
court denied the request. Tr. (October 19, 1992) at
171-73.

The court also denied a Jencks Act request for
statements made by co-conspirator Arthur Cosgro who
cooperated with the Government. Counsel indicated that
he had been given no materials that would shed light on
testimony by Cosgro with respect to a particular
conversation that he had with Appellant Flynn. Counsel
questioned whether the basis of the statement should
have been disclosed in his Jencks Act request. Tr.
(October 20, 1992) at 73-77.

The court denied Jencks Act requests on prior
statements contained in reports of interviews with co-
conspirators Thomas McQueeney and Brian Raineri, both
of whom cooperated with the Government. It is unclear
whether an erroneous legal ground was used in these
denials. Tr. (October 28, 1992) at 20 and Tr.
(November 3, 1992) at 219-20.

-56-