Diane Egger **HALLQUIST,**
**Plaintiff, Appellee,**

v.

**LOCAL 276, PLUMBERS AND PIPE-FITTERS UNION, AFL–CIO, et al.,**
**Defendants, Appellees.**

**Appeal of MAX FISH PLUMBING AND HEATING CO., INC., Defendant.**

No. 87–1873.

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 1988.
Decided March 25, 1988.

Richard W. Petrocelli with whom David M. Campbell and Visconti & Petrocelli Ltd., Providence, R.I., were on brief, for defendant.

George C. Deptula with whom Berlin, Clarey, Deptula & Levee, Boston, Mass., was on brief, for plaintiff, appellee Diane Egger Hallquist.

Before BREYER, Circuit Judge, ALDRICH, Senior Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

This is an appeal from the district court's decision that the appellant, Max Fish Plumbing and Heating Co., Inc. ("Max Fish") discriminated against appellee, Diane Egger Hallquist, because of her sex in violation of 42 U.S.C. § 2000e *et seq.* and Massachusetts General Laws c. 151B § 4. For the following reasons, we affirm the district court's judgment.

* Of the District of Rhode Island, sitting by desig-

## I. FACTS

After a non-jury trial, the district court made the following detailed findings of fact:

"1. In May 1983, Egger was a licensed journeyman plumber and a member of Local 276 of the Plumbers and Pipefitters Union located in Brockton, Massachusetts. In order to obtain her journeyman's license, Egger completed all the requirements for actual 'hands-on' plumbing work experience: she enrolled in all the required educational programs and passed all the necessary tests. Prior to obtaining her license, Egger was employed as an apprentice plumber. She worked on numerous projects, including a waste treatment center in Taunton, a one-hundred unit condominium complex, and a hot and cold water line installation project in Middleboro. Egger also worked as a 'jobber' on residential plumbing jobs, and she helped install new oxygen and vacuum lines at the Morton Hospital in Taunton. Prior to her employment with the defendant Max Fish, Egger worked at the Brockton Hospital on a project to re-route hot and cold water lines. During the time she worked at the Brockton Hospital, Egger drilled shields for the pipes. Egger also worked for her father, who owned a contracting business, on projects involving cost estimates. In addition to her training at South Easton Vocational Regional School and at Old Colony Trade School, a private school for plumbing, Egger enrolled in additional courses toward her master plumber's license.

"2. As a member of Local 276, Egger received job assignments from the Union. She was placed on a list of unemployed persons; when her name came up for a job assignment, she was referred to the job by Mr. McKeown, the business agent for Local 276. On or about Friday, May 6, 1983, McKeown assigned Egger to a plumbing job for Max Fish. She was instructed to report to the Brockton Hospital the following Monday to work on a plumbing and heating project in connection with the renovation of the Hospital. McKeown told Eg-

nation.

ger that the job would last for approximately one year.

"3. Egger arrived at the Max Fish trailer on the site of the Brockton Hospital in a timely manner on or about Monday, May 9, 1983. Present in the trailer at that time were Mr. Wilsey, Max Fish's foreman and supervisor on the job; Mr. Gunderson, the Local 276 shop steward; and Mr. Reis, another Local 276 plumber. The evidence shows that upon Egger's arrival at the trailer, Wilsey looked at her strangely and Gunderson kidded her about the fact that she was hired because the company needed a minority. The evidence also shows that Gunderson told Egger, in Wilsey's presence and without contradiction, that the job would last about one year.

"4. As the union shop steward, Gunderson's responsibilities included receiving job-related complaints from members of Local 276. Once a complaint was lodged with Gunderson, he presented it to the owner and/or other union representatives in an attempt to resolve the problem.

"5. As the foreman and field superintendent for Max Fish on the Brockton Hospital job, Wilsey's responsibilities included determining the number of employees necessary to complete the work. Wilsey had the authority to make hiring and firing recommendations to Max Fish. He also coordinated the day to day operations. At all times during her employment by Max Fish, Wilsey was Egger's supervisor.

"6. Wilsey first assigned Egger to a core drilling project which involves the use of an expensive piece of electric equipment. The core driller drills holes through cement to accommodate the placement of pipes. As a result of her previous jobs, Egger had considerable experience using core drilling equipment. She told Wilsey about her experience, but Wilsey insisted on showing her how to use it. He drew circles on the cement to mark the areas for drilling, which Egger considered to be demeaning of her skills. Wilsey also checked on Egger's progress once every hour, a level of supervision which Egger testified was unusually frequent.

"7. Before she began to drill, Egger was not permitted to examine the 'as built' plans of the pre-existing structure of the hospital. Egger considered these drawings to be important for her to review because the core drilling machine was operated while water flowed through it and while she stood in a pool of water. By reviewing the drawings, Egger could have located the live wires so that she would not drill into one and receive a shock.

"8. After Egger completed the core drilling, Wilsey assigned her to drill shields for hangers. This work involves the drilling of shields into the ceiling to support pipes. As a result of her previous jobs, Egger had considerable experience drilling shields. In fact, she drilled shields for nine months during her prior job at the Brockton Hospital. In spite of her experience however, Wilsey and Gunderson continued to monitor her closely. Also, while she was drilling shields, other workmen who were neither employees of Max Fish, nor members of Local 276, kidded Egger. They called her 'Diane Shields,' a nickname she had earned because of her previous nine-month stint drilling shields. When Wilsey inquired of Egger about why the workmen were joking with her, both Wilsey and Gunderson laughed at her when she told them the reason.

"9. The third and final project Wilsey assigned to Egger involved assisting Mr. Green, a senior plumber from Local 276, with work on the air condensing unit located on the roof of the hospital. There was a second air condensing unit on the roof but no one had begun work on it. When Egger inquired of Wilsey whether she could start work on the second condensing unit, Wilsey told her not to worry about it, and that she should continue to assist Green by shining and cutting copper. Such work is generally not assigned to a licensed plumber for three consecutive days.

"10. On or about May 18, 1983, which was approximately the seventh day of Egger's employment with Max Fish, Egger took an afternoon coffee break with Wilsey, Gunderson, other plumbers from Local 276, and some other workmen. During the

coffee break, Gunderson kidded Egger about the men's reaction to her when she walked onto a big job. Egger told Gunderson that usually the men would refuse to speak to her and instead just look at her. Gunderson then asked Egger whether the men ever said anything to her. Egger responded by stating the [sic] once when she walked onto a job, the superintendent said 'don't tell me they have sent me a fucking woman.' Gunderson then turned to Wilsey and asked Wilsey whether he had said something like that. According to Egger, Wilsey responded: 'I said it, but just not to her face.' As a result of Wilsey's comment, all of the men laughed, and Egger testified that she felt embarrassed, humiliated, and stupid. Wilsey testified that he never made such a remark. Furthermore, Wilsey maintained that Egger's testimony that he had made such a remark was a personal affront. I find credible Plaintiff's detailed recollection of this particular exchange.

"11. After the coffee break, Egger returned to work on the roof. When she went downstairs later, Wilsey handed Egger an envelope. He told Egger that she was laid off. At first Egger thought that Wilsey was kidding, but Wilsey repeated that it was not a joke. Wilsey told Egger that she was laid off due to a lack of work. Egger was very mad and upset, and she cried after leaving Wilsey's presence.

"12. As she left the hospital, Egger told Gunderson that she had been laid off. According to Egger, Gunderson was surprised. He told her that he had not known this was going to happen. Egger then complained to McKeown, the union business agent, about the lay-off. McKeown contacted a representative of Max Fish, a foreman by the name of Upham, and was told that Egger had been laid off due to her unsatisfactory work. Wilsey testified that Egger's work was at all times satisfactory. I am persuaded that the purported reason for Egger's lay-off was lack of work, not her unsatisfactory performance.

"13. Plaintiff introduced evidence to show that, according to the construction plans, there was a substantial amount of work that was not completed at the time of her lay-off. The construction plans indicate the addition of a new bathroom requiring substantial new piping to be installed in the area where Egger performed the core drilling. Before she was laid off, Egger observed that none of the new piping had been installed. Plaintiff introduced further evidence to show that the pipes for which she drilled shields were not installed by the time she was laid off. Furthermore, at the time she was laid off, work had not yet begun on the second condensing unit on the roof. Max Fish introduced evidence to show that the General Contractor, Gilbane, informed Wilsey on Monday morning, the day Egger reported to work, that the work in the gift shop area was to be put 'on hold.' According to Wilsey, this work included all pipe installation in the gift shop area. Wilsey testified that he did not lay off Egger on that Monday morning, even though the work was postponed, but instead gave her other work to perform during the week in an attempt 'to keep the crew together' in the event the work did become available.

"14. Max Fish employed plumbers from Local 276 for more than a year after hiring Egger on or about May 6, 1983. Defendant employed between three and fourteen members of Local 276 on the Brockton Hospital job between June 1983 when Egger was laid off, and April 1984 when the project ended. Egger was the fourth Local 276 plumber, and the only minority, to be hired for the Brockton Hospital job. The following chart sets forth the number of plumbers employed by Max Fish at the end of each month after Egger's termination on May 18, 1983:

| | |
|---|---|
| End of June, 1983 | 5 |
| End of July, 1983 | 6 |
| End of August, 1983 | 6 |
| End of September, 1983 | 11 |
| End of October, 1983 | 14 |
| End of November, 1983 | 14 |
| End of December, 1983 | 7 |
| End of January, 1984 | 7 |
| End of February, 1984 | 6 |
| End of March, 1984 | 5 |
| End of April, 1984 | 3 |

"15. At all times when the job existed and/or when Egger was or could have been employed by Max Fish, defendant employed approximately 70 people. The evidence is undisputed that, although Wilsey decided to lay off two plumbers, no other plumber from Local 276 was laid off at the time Egger was laid off. Instead, Gunderson was permitted to take a one-week vacation in Florida. As a result, it was unnecessary to lay off Joe Reis, the last plumber hired before Egger. After his one-week vacation, Gunderson returned to work as a full time Max Fish employee on the Brockton Hospital job.

"16. Wilsey, Gunderson, Green and Reis each worked a full week for the week ending June 4, 1983. Two weeks after Egger's termination, Max Fish hired two additional male plumbers from Local 276. Each newly-hired plumber worked a full forty-hour week for the week ending June 11, 1983. In addition, Gunderson, Wilsey, Green and Reis worked a full forty-hour week during the week ending June 11, 1983.

"17. Max Fish signed a contract with the general contractor, Gilbane Company, to perform plumbing and heating services. The ultimate value of the job to Max Fish was approximately $1.6 to $1.8 million. Pursuant to contract with Gilbane, Max Fish was under the following affirmative action duty with respect to the hiring of minority plumbers:

'11.1 During the performance of this agreement, the trade contractor agrees not to discriminate against any employee or applicant for employment because of race, color, religion, sex, or natural [sic] origin. The trade contractor will take affirmative action to insure that applicants are employed without regard to their race, color, religion, sex, or natural [sic] origin. The trade contractor will comply with all provisions of executive order No. 11246 of September 24, 1965, including all amendments, updates, and modifications to this executive order, and relevant orders of the Secretary of Labor.'

"Under its contract with Gilbane, Max Fish's job at the Brockton Hospital lasted for a period in excess of one year.

"18. Egger filed a timely complaint with the Equal Employment Opportunity Commission ('EEOC') on November 8, 1983, which is within 180 days of her lay-off by Defendant Max Fish. In her complaint, Egger alleges that her discharge from employment by Max Fish constituted discrimination based upon her sex in violation of 42 USC § 2000(e) et seq., and M.G.L. c. 151B. Pursuant to an inter-agency agreement between the EEOC and the Massachusetts Commission Against Discrimination ('MCAD'), the filing of a complaint with the EEOC constitutes the filing of a complaint with the MCAD. The EEOC issued to Egger a notice of a right to sue letter on February 26, 1985."

After a non-jury trial, the district court found that Max Fish's proffered reason for firing Egger—that there was insufficient work—was, considering all of the evidence, "unworthy of credence" and that Max Fish had intentionally discriminated against Egger.

A district court's finding of intentional discrimination in a Title VII case shall not be disturbed unless it is clearly erroneous. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Lamphere v. Brown Univ.,* 798 F.2d 532, 542 (1st Cir.1986); *Kumar v. Board of Trustees, Univ. of Mass.,* 774 F.2d 1, 9 (1st Cir.1985), *cert. denied,* 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986). "We shall look carefully, however, to detect infection from legal error, and of course the clearly erroneous standard does not shield findings that are unsupported or arbitrary." *Kumar,* 774 F.2d at 9 (quoting *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 109 n. 2 (1st Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980)).

The Supreme Court set out the order and allocation of burdens of proof in Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

First, the plaintiff has the burden of proving by the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 802, 93 S.Ct. at 1824, *quoted in Fields v. Clark Univ.*, 817 F.2d 931, 934 (1st Cir.1987).

We have held that in firing cases, such as is presented here, a plaintiff establishes a prima facie case by demonstrating that she was qualified for the position, performed the job satisfactorily, and that after she was fired, the "employer sought a replacement with qualifications similar to her own, thus demonstrating a continued need for the same services or skills." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir. 1979).

In this case, the district court found that Egger had made a prima facie case of discrimination by showing that she was qualified for the position, that there was no credible allegation that she had performed unsatisfactorily, and that two weeks after she was fired, Max Fish hired two male plumbers to complete the job she was originally hired to perform. The court further found that Max Fish had satisfied his burden of articulating a non-discriminatory reason for the firing, namely that a stop-work order had been issued by the general contractor and there was insufficient work to keep Egger employed. The court then held:

Based on the evidence admitted during the trial of this case, Egger satisfied her ultimate burden of proof by showing this Court by a fair preponderance of the evidence that Max Fish's proffered explanation for her lay-off, namely a lack of work, is unworthy of credence. Egger's evidence shows that when she reported to work on Monday morning, Wilsey was unsettled by the fact that the union sent a woman for the job. The evidence shows that Wilsey laughed at and told gender-related jokes in Egger's presence and at her expense. Egger's evidence further shows that Wilsey closely supervised or "babied" her in a manner that demeaned her demonstrable plumbing skills. Most importantly, despite the fact that Wilsey decided to lay off two plumbers, only Egger was actually laid off. Reis' job was protected by virtue of the fact that Gunderson was permitted to take a one-week vacation and to return to full-time work the following week. No such steps were taken to protect Egger's job. Finally, Egger's evidence shows that, with the exception of the week when Egger was laid off and Gunderson was on vacation, Max Fish continued to maintain, and add to, his plumbing force. Such a level of employment simply does not demonstrate a shortage of work. The totality of the evidence lends no credence to the defendant's assertion that there was an insufficient amount of work to keep Egger employed.

■ Appellant primarily attacks the district court's reliance on testimony by Egger that work was available on the job site after she was fired. Appellant contends that such testimony should not have been permitted because Egger did not have personal knowledge of whether in fact a stop-order had been issued; he argues that the court's reliance on this evidence to demonstrate pretext renders the court's ruling "clearly erroneous."

While it is, of course, true that Federal Rule of Evidence 602 requires that a witness have "personal knowledge" of the matter to which she is asked to testify, we do not believe that Egger's testimony is deficient under that Rule.

We have very carefully searched the trial transcript and simply cannot find any testimony by Egger about the existence of a stop-work order. What appellant apparently interprets as such testimony is reflected in pages 39 to 46 of the trial transcript, in which it is indicated that Egger was shown

the blue-prints of the Hospital Renovation project, was asked to identify which areas she had worked, and further asked to indicate whether, based upon her personal observations, the work indicated in the blue-prints had actually been finished. She at no time testified about what work Max Fish was actually authorized by the general contractor to perform at any given time; rather, her testimony was confined to descriptions of the projects she was assigned to perform and whether those projects were completed or needed additional work at the time she was fired.

What appellant appears to be arguing is that Egger's testimony is inadmissible because she did not have personal knowledge of circumstances which may, on balance, diminish the *value* of the testimony. This is not our understanding of Rule 602. "The *extent* of a witness' knowledge of matters about which he offers to testify goes to the weight rather than the admissibility of the testimony." *Nielson v. Armstrong Rubber Co.*, 570 F.2d 272, 277 (8th Cir.1978); *see M.B.A.F.B. Federal Credit Union v. Cumis Ins. Soc'y, Inc.*, 681 F.2d 930, 931 (4th Cir.1982). Evidence is inadmissible under this rule only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testified to. 2 J. Wigmore, *Evidence* § 658 (J. Chadbourn Rev.1979); 3 J. Weinstein & M. Berger, *Weinstein's Evidence*, § 602[02] (1981). Because Egger's testimony reflects only what she had observed while on the site, we do not believe that the trial court abused its discretion in admitting it. *Cf. United States v. Ranney*, 719 F.2d 1183, 1188 (1st Cir.1983).

The appellant also argues that even if this testimony is admitted, the trial court was clearly erroneous in its finding that plaintiff had satisfied its burden of proving by a preponderance that the appellant's asserted non-discriminatory justification was pretextual. We disagree.

■ First, we believe that appellant's argument that the only way Egger could have prevailed in this case was to prove the "non-existence of the stop work order" misconceives the nature of the inquiry in Title VII cases. The ultimate "factual inquiry" to be decided by the trial court is "[whether] the defendant intentionally discriminated against the plaintiff." *U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1982) (quoting *Texas Dep't of Comm. Aff. v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). Under the *McDonnell Douglas* test, once the defendant articulates a non-discriminatory reason, the plaintiff has the burden of showing not that the proffered reason was fabricated, but that it "was not the true reason for the employment decision." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. In other words, the district court need not have found, in order to hold for Egger, that the appellant's uncontradicted testimony regarding the existence of the stop work order was "unworthy of credence," but that the appellant's assertion that it was the *reason* for the firing was "unworthy of credence."

■ Second, we have always recognized that "direct" evidence of discrimination is elusive in Title VII cases. *See, e.g., T & S Service Assoc. v. Crenson*, 666 F.2d 722, 724 (1st Cir.1981). The district court must perform the "sensitive and difficult" task of evaluating all of the competent circumstantial evidence before it and, to put it simply, "decide which party's explanation of the employer's motivation it believes." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. As we noted earlier, our role as a reviewing court is strictly circumscribed. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1984). Here, the trial court found that although the only woman on the staff was fired, the appellant took affirmative measures, such as juggling vacation time, to retain all of his male employees. The court further found from uncontradicted evidence that soon after Egger was fired, the appellant sought and hired two additional male plumbers. On top of this circumstantial evidence, there was direct evidence from which the court

could plausibly infer that the appellant was displeased that the union had sent a woman. For example, the union shop steward's statement, in the presence of Egger and the company foreman, that Egger was hired because the company needed a minority, and the foreman's comment that he was disheartened that the union had "sent me a fucking woman," although allegedly made in jest, serve to undermine any contention that Egger's treatment had nothing to do with the fact that she was a woman. Finally, the district court found that Egger, though indisputably qualified, was permitted to perform only simple tasks unbefitting a craftsperson of her experience and skill and that even then she was carefully supervised; this finding also adds to the cumulative weight of other more substantial evidence that Egger was in fact treated differently because of her sex.

Based upon a review of the evidence, we cannot say that the district court's finding of intentional discrimination is unsupportable. Defendant's case rests primarily on the claim that plaintiff was discharged because the work to which she was assigned was halted by the general contractor. The court was not obliged to accept this, particularly in light of the testimony of defendant's superintendent that this job was on hold the very day plaintiff arrived.

*Affirmed.*