**Dr. María Virginia HERNÁNDEZ LORING, Plaintiff,**

v.

**UNIVERSIDAD METROPOLITANA, et al., Defendants.**

**No. Civ. 97–1215(SEC).**

United States District Court, D. Puerto Rico.

Feb. 14, 2002.

**2.** *See also* plaintiffs' Opposition (docket No. 31); defendants' Reply (docket No. 32) and plaintiffs' sur-reply (docket No. 33).

Wilfredo A. Geigel, Gallows Bay, Christiansted, St. Croix, VI, for Plaintiff.

Jose De-La-Cruz-Skerret, Marta L. Martinez-Rodriguez, San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Before the Court is Defendants' motion for partial summary judgment (**Docket # 94**). For the reasons set forth below, and after considering Plaintiff's opposition to the motion (**Docket # 98**) and Defendants' reply (**Docket # 103**), Defendants' motion is hereby **granted.**

### Background

Plaintiff filed this action for damages resulting from the alleged negligence, breach of contract, abuse or lack of due process in the evaluation for academic promotion at the Universidad Metropolitana (UMET) an institution within the Ana G. Méndez University System (SUAGM). Plaintiff also claimed damages resulting from an alleged sexual harassment from a UMET professor who presided the rank Committee that evaluated her, and did not recommend her rank promotion. She claims damages for *quid pro quo* and hostile environment sexual harassment.

In May 1998, Defendants filed a motion for summary judgment. This Court entered judgment on August 20, 1999 dismissing the Complaint in its entirety. Plaintiff appealed, and on December 1, 2000, the Court of Appeals for the First Circuit affirmed the judgment dismissing Plaintiff's due process claim, and vacated and remanded for further proceedings the *quid pro quo* and hostile environment sexual harassment claims. The Court of Appeals's Opinion and Order provided that nothing prevented Defendants from filing a second motion for summary judgment on the *quid pro quo* claim. It is precisely this second motion for summary judgment on the *quid pro quo* claim **only** that is before the Court today.

Plaintiff began working with the Ana G. Méndez University System in 1973. She was an Instructor in the Puerto Rico Junior College, one of the institutions that comprised the System, until March 30, 1976, when she earned tenure. In 1980, she submitted her thesis and obtained a Ph. D. Beginning in 1981, she worked as an Instructor at Colegio Universitario Metropolitano (today UMET), where she was promoted in 1983 to Auxiliary Professor. In 1988, she submitted her application for an available position as Associate Professor, and after the evaluation and interview by the Rank Committee, she was granted said rank.

Annually, the Academic Board appoints the Rank Committee which is responsible for evaluating all candidates for rank promotion in that academic year. For the academic year 1994–1995, the Academic Board appointed five members from within the academic community. Thereafter, UMET's Chancellor, Dr. René Labarca, announced the available positions for Professor, Associate Professor and Auxiliary Professor ranks.

Plaintiff, Dr. Ana M. Delgado, Dr. Jaime Hamilton and Prof. Wanda Sánchez, all submitted applications for promotion to the rank of Professor. The Rank Committee evaluated all the candidates' files, conducted interviews with each candidate, and finally rendered a report and recommendation to the Academic Board.

Three out of the four candidates for promotion to Professor, obtained a score higher than 360 points of a maximum of 450. The score of 360(80%) was the minimum required for eligibility for promotion. Plaintiff Dr. María Virginia Hernández Loring obtained 350 points (76%), the lowest score among the four candidates; while the others obtained: 430(96%) for Dr. Ana M. Delgado, 430(96%) for Dr. Jaime Hamilton and 370(82%) for Prof. Wanda Sánchez.

The evaluation for promotion requires compliance with a variety of academic criteria, which are established in the University's regulations, and which are included in the evaluation instrument used by the Committee. Plaintiff claimed that if she had been awarded higher points in certain items she would have obtained a higher score.

Unsatisfied with the result obtained, Plaintiff questioned the procedure and the evaluation committee's composition, alleging that they were incompetent and not her peers. She also alleged being sexually harassed by Dr. Luis R. Diaz, President of the Committee. She stated that he was biased against her because she refused his sexual advances and that in retaliation for this refusal, she had been denied promotion.

**Summary Judgment Standard**

Fed.R.Civ.P. 56(b) provides that: "A party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the mov-

ant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28 (1st Cir.1994). "The principal judicial inquiry required by Rule 56 is whether a genuine issue of material fact exists." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2725, p. 401.

In this regard, the First Circuit Court of Appeals has noted that for a dispute to be "genuine", there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir.1992); *See also Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989); *Medina Munoz v. R.J. Reynolds Tobacco*, 896 F.2d 5, 8 (1st Cir.1990) ("A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most favorable to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.") (citations omitted).

By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). "A fact is material if it tends to resolve any of the issues that have been properly raised by the parties." Wright, Miller & Kane, *supra*, § 2725 at p. 419. "Not every genuine factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Martinez*

*v. Colon*, 54 F.3d 980, 983–984 (1st Cir. 1995).

In addition, when determining whether to grant summary judgment, the Court may not weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* (*citing Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines*, 42 F.3d at 684.

While the moving party has the burden of initially establishing that there is "an absence of evidence to support the non-moving party's case", *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1984); **the nonmovant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions."** *Lawton v. State Mutual Life Assurance Company of America*, 101 F.3d 218, 223 (1st Cir.1996). Furthermore, "the nonmovant must produce specific facts, in suitable evidentiary form sufficient to limn a trialworthy issue ... Failure to do so allows the summary judgment engine to operate at full throttle." *Id.*; *see also Kelly v. United States*, 924 F.2d 355, 358 (1st Cir.1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medina Munoz*, 896 F.2d at 8, *quoting Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989) ("The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have sub-

stance in the sense that it limns differing versions of the truth which a factfinder must resolve.")

### Applicable Law and Analysis

■ As noted previously, Plaintiff Hernández Loring contends that Luis Diaz Rivera, as an influential member of her tenure review committee, prevented her promotion in retaliation for Plaintiff's refusal to succumb to his sexual advances. It is not entirely clear whether Plaintiff is bringing her *quid pro quo* claim under Title VII, 42 U.S.C. § 2000e–2(a)(1) (1994), or whether she is invoking Puerto Rico statutory law, including the ban on sexual harassment. 29 P.R.Laws Ann. § 155b (1995). Nevertheless, the substantive law of Puerto Rico on sexual harassment is aligned, so far as pertinent here, with Title VII law, and Title VII precedents are used freely in construing Commonwealth law. *Rodriguez Hernandez v. Miranda Velez,* 132 F.3d 848, 854 (1st Cir.1998).

Article II § 1 of the Constitution of the Commonwealth of Puerto Rico states: "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas. Both the laws and the system of public education shall embody these principles of essential human equality." P.R. Const. art. II, § 1. These constitutional axioms are now embodied in Law 100 of Puerto Rico of June 30, 1959, 29 P.R.Laws Ann. § 146 *et seq.* Law 100 proscribes discrimination in the workplace against any person because of age, race, color, sex, social or national origin, social condition, and political or religious ideas.

Until 1988, sexual harassment had no independent statute, and was only accessory to discrimination based on sex. On April 22, 1988, Law 17 of Puerto Rico was passed, 29 P.R.Laws Ann. § 155 *et seq.,* specifically outlawing sexual harassment.

This statute "declares as the public policy of the Commonwealth of Puerto Rico that sexual harassment in employment is a type of sexual discrimination and, as such, constitutes an illegal and undesirable practice that goes against the established constitutional principle that the dignity of a human being is inviolable." *Id.* at § 1. Section 3 of the Act defines sexual harassment in the workplace as "any type of undesired sexual approach, demand for sexual favors and any other verbal or physical behavior of a sexual nature when one or more of the following circumstances occur: **(a) When submission to said conduct becomes, implicitly or explicitly, a term or condition of the person s employment[;] (b) When submission to or rejection of such conduct by the person becomes the grounds for decisions on the job, or regarding the job, that affect that person[;]** (c) When that conduct has the effect or purpose of interfering unreasonably with the performance of such person's work or when it creates an intimidating, hostile or offensive working environment." *Id.* at § 3 (emphasis added).

On the other hand, in the federal sphere, Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000e, *et seq.,* makes it an unlawful labor practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.2000e–2(a)(1). A hostile or abusive work environment may create a situation of discrimination based on sex, actionable under Title VII. In fact, the Equal Employment Opportunity Commission's Guidelines on Discrimination Because of Sex specify that sexual harassment is a form of sex discrimination prohibited by Title VII. 29 C.F.R. § 1604 .11(a) (1985).

In *Meritor v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), while addressing the issue of sexual harassment in employment, the Supreme Court established several important rules, which are embodied in Law 17 of Puerto Rico. Sexual harassment can take place in two related ways: *quid pro quo* harassment or hostile environment harassment. Defendants' motion for summary judgment, however, is limited to Plaintiff's cause of action on the *quid pro quo* claim.

 Cases based on carried-out threats are often referred to as *quid pro quo* cases. The *quid pro quo* harassment occurs when a supervisor conditions the granting of job benefits upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply with his/her sexual requests. *Quid pro quo* sexual harassment requires, among other things, that plaintiff's refusal to submit to unwelcome sexual advances or requests for sexual favors result in tangible job detriment. Therefore, a plaintiff must produce evidence showing that the harassment complained of affected tangible aspects of their compensation, terms, conditions, or privileges of employment. For example, under Title VII, *quid pro quo* sexual harassment can be shown where a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands. *Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir.1999); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 897 (1st Cir.1988). However, "a supervisor's **mere threat or promise** of job-related harm or benefits in exchange for sexual favors does not constitute *quid pro quo* harassment. . . ." *Gary v. Long*, 59 F.3d 1391, 1396 (D.C.Cir.1995) (emphasis added). *See also Carrero v. New York City Housing Auth.*, 890 F.2d 569, 579 (2nd Cir.1989) (noting that the gravamen of a *quid pro quo* claim is a tangible job benefit or privilege conditioned on an employee's submission to sexual blackmail

and that adverse consequences follow the employee's refusal); and *Highlander v. K.F.C. Nat'l Management*, 805 F.2d 644, 649 (6th. Cir.1986) (where the court established that there is no cause of action for *quid pro quo* sexual harassment where the record is totally devoid of any evidence tending to demonstrate that plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in the activity suggested by defendant).

 Therefore, in order for Hernández Loring to prevail pursuant to the doctrine of *quid pro quo* sexual harassment, she must prove: 1) that she was a member of a protected class; 2) that she was subject to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; **4) that submission to the unwelcome advances was an express or implied condition for receiving job benefits, or that refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment;** and 5) the existence of respondeat superior liability. *Oncale v. Sundowner Offshore Services. Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998); *Harris v. Forklift Systems. Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Chamberlin v. 101 Realty. Inc.*, 915 F.2d 777, 785 (1st Cir.1990); *Ruiz v. Caribbean*, 1999 WL 459968 (D.P.R.1999).

Plaintiff's *quid pro quo* claim is based on the fact that Diaz Rivera made advances at her, was rebuffed, and then used his position as head of the committee to revenge himself by blocking her promotion. Plaintiff's allegations include several incidents which, in her view, constitute sufficient grounds to establish this. We will now make a brief summary of these allegations.

On November 27, 1991, during a Thanksgiving Day lunch in the library of Universidad Metropolitana, Plaintiff sat at a table with some professors from the Education Department. According to Plaintiff, Dr. Diaz Rivera accosted her, sat very close to her and told her in an allegedly suggestive manner: "María Virginia, you are so tasty that getting laid with you just once is not enough: at least three or four times is needed." (**Docket # 53,** Opposition to Motion for Summary Judgment, Exhibit 1, Paragraph 16A). Plaintiff contends she was surprised, afraid, embarrassed and ashamed by Diaz Rivera's insinuating physical nearness as well as by his lascivious comments toward her. Diaz Rivera's actions prompted her to immediately leave the Thanksgiving luncheon, never to participate in such luncheons again. Hernández Loring spent the rest of the day in a depressive and anxious mental state. (*Id.,* Par. 16A).

On August 24, 1995, Plaintiff attended a Faculty Workshop at the University's Amphitheater. While looking for a seat, Dr. Diaz Rivera allegedly said to Plaintiff: "María Virginia, this happened to you for being such a bitch." (*Id.,* Par. 16B). This incident, Plaintiff points out, is the clearest example that bolsters her *quid pro quo* claim and indicates a clear link between her rejection of Dr. Diaz Rivera's sexual advances and her denial of tenure.

Plaintiff also alleges that several students told her that Diaz Rivera often uttered sexually-suggestive comments in the classroom, mainly directed toward the female students. (*Id.,* Par. 16). One particularly offensive scenario portrayed him saying: "Even though I am fifty-three years old, I am an expert in the tongue of the Low Countries," which one student construed as a crude reference to female body parts. Shortly after this comment, he addressed a female student and told her "I am glad that we speak the same tongue." (**Docket # 53,** Exhibit 12, Affidavit of Mayra del Valle Ortiz, paragraph 4A). These latter incidents are confirmed in the depositions and affidavits of several of her students, whom she requested to testify on her behalf. (**Docket # 53,** Exhibits 12, 14, 15 and **Docket # 98,** Exhibits 20–23).

Additionally, Plaintiff claims that on July 13, 1995 she was sexually accosted and manhandled by Chancellor Labarca, who was in a drunken stupor. Plaintiff narrates that during the faculty luncheon at the Condado Convention Center, Chancellor Labarca slid very close to her and, in full view of other faculty and administration officials, grabbed her arm and told her "María Virginia, you are just like a *pirulí* [a type of lollipop]. Even though I have transferred you from your Department, and all, I'm going to protect you." After a serious struggle, she managed to extricate herself from his grip and told him to "leave her alone." This public incident with Labarca, which lasted approximately ten minutes, led her to suffer a tachycardia episode, which forced her to abandon yet another University-sponsored luncheon and deal with her "anxiety, outrage, indisposition and depression." (**Docket # 53,** Exhibit 1, Par. 16C).

In addition to all these incidents, Plaintiff now alleges in her opposition to the second motion for summary judgment that, after undergoing electroshock therapy, she has begun to remember more clearly some other episodes of harassment. As reported by her psychiatrist, Dr. Ballon, "a fuller picture of the mistreatment she had experienced there emerged." (**Docket # 98,** Exhibit 1 at 1). The situation allegedly created by Diaz Rivera is described by Dr. Ballon as follows:

> In the spring of 2000, because of worsening depression, I prescribed a course of electro-convulsive therapy (ECT, or

shock therapy) for Dr. Hernandez [sic]. Her experience of this procedure as impersonal, dehumanizing, and demeaning triggered the most specific recollections of her abuse by Dr. Diaz. On June 8, 2000, she recalled the many episodes of Dr. Diaz entering the ladies rest room at the university. On January 9, 2001, she recalled the setting of the yellow-tiled bathroom. Dr. Diaz would enter the bathroom and wait for her there, leaning against the wall. When she would emerge from the stall, he would open his fly and say: "Remember what you need," and then he invited her to "lay down with me." Terrified, she would back away, find the door, and run out. She said that the abuse by Dr. Diaz began about two years after the death of her father, her divorce, and her hospitalization for depression. The harassment she experienced at the university seemed to render her unable to date men for ten years thereafter, until she met her current husband. She felt shame and guilt as if she had done something wrong. My last visit was on May 2, 2001, at which time she was planning to return to live in Puerto Rico with her husband.

*Id.* at 2–3.

Even assuming arguendo, that we accepted Plaintiff's account of Diaz Rivera's and Labarca's alleged sexual improprieties towards her, in a *quid pro quo* harassment claim, she must still establish a colorable claim that her denial of tenure by the review committee was directly linked to Diaz Rivera's need to quell his sexual revenge upon her. Even if the episodes described above were enough to prove four of the five prongs of the test for *quid pro quo* claims discussed previously, Plaintiff might still have failed to show a causal link between her refusal of Diaz Rivera's sexual advances and the actions of the other four committee members. Even if Diaz Rivera's evaluation was indeed tainted by his contempt of Plaintiff (motivated by Plaintiff's objections to Diaz Rivera's elevation to full professor, as well as her refusal to cater to his sexual whims), it does not necessarily follow that Diaz Rivera manipulated the entire committee to satisfy his own petty needs for revenge.

At first blush, it seems unlikely that the private animus of one committee member, even the presiding member, would be enough to make the other members of the committee rank Plaintiff last among four candidates in the evaluation, giving her a numerical score below the minimum necessary to qualify for promotion to full professor. On the other hand, it is not impossible: conceivably a biased chair could have influenced other members privately or, depending on how the score was developed, a very low score from one member could have had a disproportionate result.

Faced with a motion for summary judgment, Plaintiff needs to establish that there exists evidence creating a trial-worthy claim that Diaz Rivera had caused her to be denied the promotion. Fed.R.Civ. p. 56(e); *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The only part of the accounts narrated by Plaintiff which goes to this issue of causation is the deposition testimony where she stated that Diaz Rivera himself boasted to her that he had caused her denial of the promotion because she had spurned him. We must take into account that Plaintiff can offer no details on just how he managed to pull this off. One could also argue that such a statement by Diaz Rivera could have been a cruel deceit to make a denial of promotion on the merits even more painful. But an admission from a wrongdoer is powerful proof even without detail. *See Hallquist v. Local 276, Plumbers & Pipefitters Union,* 843 F.2d 18, 24–25 (1st Cir.1988).

■ There is no evidence, apart from Plaintiff's own testimony, that Diaz Rivera ever made the critical admission. This is true, even if the likelihood that the boast was made is somewhat enhanced, even if indirectly, by the evidence from the students as to how Diaz Rivera generally behaved. We must closely scrutinize Plaintiff's allegations. To reiterate the First Circuit's admonition on the Court's application of the federal summary judgment standards, a Court has an obligation to weed out claims which rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Medina Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). In particular, we must remember that hearsay statements, conclusory averments, self-serving declarations, speculation or conjecture, and inadmissible expert opinions can sometimes not be enough to withstand a well-bolstered motion for summary judgment. *Vazquez v. Lopez–Rosario*, 134 F.3d 28 (1st Cir. 1998).

So, let us compare the alleged non-specific boast made by Diaz Rivera with the evidence presented by Defendants in their motion for summary judgment. Defendants have provided us with the detailed description of the review procedure that was absent from their previous motion for summary judgment. The Rank Committee appointed by the Academic Board for academic year 1994–1995 consisted of:

- Luis R. Diaz Rivera, President, Professor, Ed. D. General Education
- María del C. Monserrat, Professor, Ph. D. in Spanish Literature
- Nilda López Cruz, Associate Professor, Ph. D. in Sociology of the Family
- Martha Martínez de Ramos, Associate Professor, Masters Degree in Business
- Carmen Bigas Rodríguez, Assistant Professor, Masters Degree in Nursing

All but one of these members, had previous experience as members of the Rank Evaluation Committee, and they are allegedly well respected within the academic community. Dr. María del C. Monserrat, is a very active member of the academic and social community, and is also a Nun; Dr. Diaz has served as Dean of Education and Dean of Academic Affairs; while Dr. López, Prof. Martínez and Prof. Bigas have been members of the Academic Board. Prof. Carmen Bigas was a first timer in the Rank committee in 1994–1995, and she was appointed again in 1996.

The Rank committee for academic year 1994–1995 evaluated all the candidates' files, conducted interviews with the candidates and finally rendered a report and recommendation to the Academic Board (Junta Académica) according to their Rules and Regulations. A score of 360(80%) was the minimum required for eligibility for promotion. Three out of the four candidates for promotion to Professor obtained a score higher than 360 points. The final results for all candidates were: 430(96%) for Dr. Ana M. Delgado, 430(96%) for Dr. Jaime Hamilton, 370(82%) for Prof. Wanda Sánchez, and 350(78%) for Plaintiff.

Perhaps more importantly, though, Defendants have included with their motion for summary judgment four sworn statements, one by each of the committee members. (**Docket # 94**, Exhibits F–I). Regarding the procedure through which the scores were calculated, each member of the committee has reaffirmed, under oath, that all the scores were responsibly and voluntarily assigned by them individually. *Id.* They have all attested to the fact that they were not coerced or pushed in any way by Diaz Rivera, or by anyone else, to give a lower score to Plaintiff. *Id.*

■ The assertion of the committee members, under oath, as to their individual decisions, free from influence or manipulation, leaves Plaintiff with no reasonably

credible evidence to demonstrate her allegation that the group of professionals that evaluated her were in any way responding to any animus created by her refusal of Diaz Rivera's sexual advances. Plaintiff also lacks evidence to establish that the Rank Committee was biased and provided an unfair evaluation of her application for promotion. The Committee members' sworn statements are consistent, plausible, and unimpeached, and reaffirm what they declared on their respective depositions in 1996. The alleged boast by Diaz Rivera is simply not enough against these solid affidavits.

The First Circuit Court of Appeals itself warned that "[i]f the four committee members told a consistent story that effectively disproved Diaz Rivera's boast, it is not clear that a reasonable jury could accept the boast; nor would Hernández Loring automatically be entitled to a trial simply in the hope that the jury might disbelieve consistent, plausible, and otherwise unimpeached testimony from four other witnesses, even if (dubitante) they were technically 'interested' parties. *See Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)." *Hernandez Loring v. Universidad Metropolitana,* 233 F.3d 49, 54 (1st Cir.2000). This is exactly what has happened in this second motion for summary judgment.

Even assuming, as we must, for purposes of this summary judgment motion, that Diaz Rivera harbored such grievous resentment toward Plaintiff, we cannot conclude that his personal contempt tainted not only his evaluation, but also the evaluations of the entire review committee, as well as the concomitant appeal process of Plaintiff's tenure petition. To adopt Plaintiff's allegations, we would have to infer a conspiracy between Diaz Rivera, Carmen Bigas, Marta Ramos, Nilda López, María del C. Monserrat, and Dean René Labarca. Having the benefit of the committee members' unimpeached affidavits to the contrary, we cannot permissibly embark on such an unreasonable leap of faith, and neither could a jury.

There is no reasonably credible evidence to sustain the allegation that the committee's decision of not recommending Plaintiff for promotion was not an academic decision or that it was tainted, biased or coerced. Under these circumstances, Plaintiff cannot establish the elements required to prevail pursuant to the doctrine of *quid pro quo* sexual harassment.

### Conclusion

For all the reasons stated above, Defendants' motion for summary judgment is **GRANTED,** and Plaintiff's *quid pro quo* sexual harassment claim is **DISMISSED WITH PREJUDICE.** Nonetheless, Plaintiff's hostile environment claim still survives. The parties are reminded that a Pretrial Conference is scheduled for February 21, 2002 at 4:30 p.m.

**SO ORDERED.**